| JOHN W. WALKER, ADMINISTRATOR OF SAMUEL HOUSE ET AL vs. WILLIAM A. HOUSE. | MARCH TERM, 1848. |

[PARTNERSHIP—PARTNERS—RECEIVER—INJUNCTION—PRACTICE.]

A RECEIVER will not be appointed upon the application of the representatives of the deceased partner against a surviving partner, unless the latter has been guilty of mismanagement and improper conduct.

If both partners are dead, and the representatives of one institute a suit for an account against the representatives of the other, the court will, as a matter of course, appoint a receiver.

Where both parties are alive, and either has a right to dissolve the partnership, and the agreement between them makes no provision for closing up the concern, equity will, as of course, appoint a receiver if they cannot arrange the matter between themselves.

Each partner has an equal right to the possession of the partnership effects, and to collect and apply them in satisfaction of the debts of the firm.

The surviving partner has, by law, a right to the custody, care, and management of the joint estate, and a court of equity will not take the business of settling it up from him, and appoint a receiver, unless confidence be destroyed by his mismanagement or improper conduct.

The surviving partner alone can sue or is suable at law upon claims due to and by the firm, the executor of the deceased having a right to insist upon the

application of the joint property to the payment of the joint debts, and a division of the surplus.

If the surviving partner does not within a reasonable time account with the executor of the deceased, and come to a settlement with him, equity will interfere in an effectual way, to prevent injury to the representative of the deceased.

A court of equity will interfere, by the appointment of a receiver, with much less reluctance in the case of a partnership which has closed, than during its continuance.

In the case of a subsisting partnership, the court will never, on motion, appoint a receiver unless it appears that the plaintiff will be entitled to a dissolution at the hearing.

Upon the death of one partner, it is the duty of the survivor to cease carrying on the business of the firm ; his authority from that time is limited to winding up the affairs of the partnership, and to this end he may receive the debts due to, and apply the assets in discharge of the debts due by it.

If he passes this limit, and undertakes to carry on the partnership business, or engage in new transactions, contracts, or liabilities, it is an abuse for which the court would be justified in appointing a receiver.

The death of one partner puts an end to the partnership from the time of the occurrence of that event, whether known or unknown, or whether third persons have or have not notice thereof, and any new obligations bearing the partnership signature are not binding on the firm, but only upon the surviving partner who signed them.

The executor of a deceased partner has the right to insist that the value of the property of the firm shall be ascertained by a sale ; the survivors have no right to take the whole property, do what they please with it, and settle with the executor upon a calculated value.

Where an injunction is granted to preserve the property of a partnership from waste, until the application for a receiver can be heard, its continuance must depend upon the fate of the latter application ; if the receiver be refused, the injunction must be dissolved.

The appointment of a receiver does not merely carry with it an authority to sell the remaining stock of the firm, but confers the general power to take possession of its books, papers, and effects, to receive its outstanding debts, and wind up its affairs.

Such appointment completely displaces and supersedes the authority of the surviving partner, putting the receiver in his place, and clothing him with all the rights and duties which the law confided to such partner.

Where an order appointing a special Auditor required him, before acting, to take an oath for the faithful performance of the duties of his office, it must appear in his report that he did take the oath ; otherwise, his proceedings are wholly irregular, and the accounts stated by him cannot furnish the foundation of a decree.

[The original bill in this case was filed on the 1st of May, 1848, by the administrator, widow, and heirs at law, of Samuel House, deceased, and charges that in 1835, the deceased formed

a partnership with his son, William A. House, in a large lumber business, the father having a large capital, and the son but little; that the son was to have one-third of the profits, and the deceased two-thirds; that large profits were made from this business, but how much complainants cannot say, as they cannot get access to the books; that the deceased died on the 2d of January, 1848, and for more than a year previous had been insane and not capable of attending to business; that defendant has since had the sole management of the business, and has given no account to any of complainants of the condition of said concern, though often requested· to do so, but on the contrary, and notwithstanding the dissolution of the firm by the death aforesaid, he has gone on and made purchases of lumber, for which he has given the notes of the firm, and mixed said lumber with the lumber of the firm; that since the death aforesaid, he has received more than $10,000 of the money of the firm, and has only paid debts to about $1900; that he has sold lumber of the firm, and rendered no account thereof, and has failed, on request, to make a settlement of the partnership affairs with the administrator aforesaid, and has refused to settle the same by arbitration, or to give security for the faithful disbursement of the partnership effects, and for payment of what, on settlement, he may owe, or to allow the books to be entrusted to an accountant, so that they may be settled; that in said books are many erroneous and improper entries made by him or his direction, many credits being entered to which he has no right, and many charges made against the deceased which are wrong; that he having charge of the cash of the firm, has charged the deficiencies in cash to profit and loss, and having control of the books, they have not been correctly balanced for years; that he has credited himself with profits, whilst he has given no corresponding credits to the deceased; that he has taken stock in incorporated companies in his own name, having paid for the same with the moneys of the concern, and not charged himself with such moneys; that the administrator aforesaid has applied to him for a balance-sheet of the business of the firm, which he has declined to give, the only

papers which he has furnished being papers marked A. B. and C., herewith filed; that complainants apprehend serious loss to the estate of the deceased, if the said partnership affairs should remain under his management; that he has been using the name of the concern for his own use and benefit, and has sold large amounts of the property of the firm, and hath not accounted therefor.

The bill, then, prays for an account, and in the mean time for an injunction prohibiting defendant from further meddling with the partnership effects, and from receiving or collecting the debts due the partnership, and from using the partnership name in any manner whatever, and from selling the property of the partnership, and that a receiver may be appointed to wind up the business of the said partnership estate, and for further relief. The bill also contains special interrogatories as to the charges above set forth.

By an amended bill filed on the 3d of May, 1848, among other things it is charged that complainants believe, from the statements made by defendant, that he is insolvent, unless he has secreted the funds and property of the said firm, and that complainants will be defrauded and irreparably injured by him, unless they can be protected by the interposition of this court.

The injunction was granted as prayed, and the application for a receiver directed to stand for hearing on a day fixed.

The answer of the defendant, filed on the 20th of May, 1848, denies fully and emphatically all the charges of misconduct contained in the bills, except so far as is explained in the opinions of the Chancellor. It is of great length, and the material parts of it are sufficiently stated in the Chancellor's opinions, the first of which was delivered upon the hearing of the application for the appointment of a receiver.]

THE CHANCELLOR:

After a very careful consideration of the facts and circumstances of this case, and an attentive examination of the authorities referred to in the argument, and others applicable to the subject, my mind has been brought to the conclusion that this is not a fit case for the appointment of a receiver.

Whatever may be the course of the court in regard to such appointment in the case of living partners, when either has a right, at his pleasure, to dissolve the connection, or where the partnership is terminated by the mere efflux of time, there cannot, I think, be found any case in which a receiver has been put in upon the application of the representatives of a deceased partner against the survivor, unless he has been guilty of mismanagement and improper conduct. *Gow on Part.*, 382; *Philips* vs. *Atkinson*, 2 *Bro. Ch. Rep.*, 272. It is true, if both partners are dead, and the representatives of one institute a suit against the other, the court will, as a matter of course, appoint a receiver, and the reason given for this distinction between the case of the representatives of a deceased partner suing the survivor, and the case of the representatives of one deceased partner suing the representatives of the other, when both are dead, is, that notwithstanding the death of one, confidence in the other partner remains, whereas, when both are dead, there is no confidence between their respective representatives. This is the reason given by Lord Thurlow, in 2 *Brown, Ch. Rep.*, 272, and by *Gow*, 282, 283, and *Collyer*, 197.

It was said by Chancellor Walworth, in the case of *Law* vs. *Ford*, 2 *Paige*, 310, that where either partner has a right to dissolve the partnership, and the agreement between the parties made no provision for closing up the concern, it was, of course, to appoint a manager or receiver on a bill filed for that purpose, if they could not arrange the matter between themselves, and this appears to be reasonable, because, as a general rule, each partner has an equal right to the possession of the partnership effects, and to collect and apply them in satisfaction of the debts of the firm. But that was the case of a dissolution, *inter vivos*, where the equal rights of the partners (they being unable to agree as between themselves) would seem to render the interposition of the court in this form indispensable. But the case of a proceeding by the representatives of a deceased against a surviving partner, is wholly different; the latter, by law, has a right to the custody, care, and management of the joint estate. He is the person in whom the deceased reposed confidence, and

unless, therefore, the court is satisfied that he cannot be safely entrusted with the joint estate, the right thus conferred upon him by law, and confirmed by the confidence of his deceased partner, should not be wrested from him.

Chancellor Kent says, on the dissolution by death, the surviving partner settles the affairs of the concern, and the Court of Chancery will not take the business from him and appoint a receiver, unless confidence be destroyed by his mismanagement or improper conduct. 3 *Kent's Com.*, 63, and see *Evans* vs. *Evans*, 9 *Paige*, 178. The surviving partner alone can sue or is suable at law upon claims due to and by the firm, the executor of the deceased having a right to insist upon the application of the joint property to the payment of the joint debts, and a division of the surplus. *Ex parte Ruffin*, 6 *Ves.*, 126. And if within a reasonable time the survivors do not account with him and come to a settlement, a court of equity will interfere in an effectual way to prevent injury to the representatives of the deceased.

But still there are rights and duties which devolve upon a surviving partner upon the death of his associate, and he is to be allowed a reasonable time for their performance, during which this court will not interfere and transfer them to other hands, unless by acts of mismanagement or misconduct, the confidence otherwise due him shall be destroyed. *Gow*, 378; *Story on Part.*, sec. 344; *Hart* vs. *Schrader*, 8 *Ves.*, 317.

The counsel for the complainants has pressed upon the court the distinction between the case of a subsisting partnership, and one which has terminated, whether by the act of the parties, effluxion of time, or death, or bankruptcy. And there can be no doubt that the court will interfere by the appointment of a receiver, with much less reluctance in the case of a partnership which has closed, than during its continuance. The reason for this difference is pointed out in the cases referred to by Judge Story in section 231, in his treatise on the Law of Partnership, and the note to the section. The reason, in truth, is an obvious one. In the case of a subsisting partnership, the court will never interpose in this way unless for such gross

abuse and misconduct on the part of one partner as that a dissolution ought to be decreed, and the affairs of the concern wound up, for otherwise as observed in one of the cases, the court might make itself the manager of every trade in the kingdom. *Goodman* vs. *Whitcomb*, 1 *Jacob and Walker*, 569. It, therefore, results that the court will never, on motion, appoint a receiver to take possession of the property and effects of a subsisting partnership, unless it appears that the plaintiff will be entitled to a dissolution at the hearing. The court, as was said by the lord chancellor, in *Waters* vs. *Taylor*, 15 *Ves.*, 10, and *Peacock* vs. *Peacock*, 16 *Ves.*, 57, will always pause before it takes a step likely to be so serious to the parties as the appointment of a receiver, which necessarily breaks up the business of the firm.

But, although there is less difficulty in granting this species of relief in the case of a partnership which has already determined, than in one which is still in existence, and although cases may be found in which, where the partnership is dissolved by the act of the parties, judges have said the court will, as of course, appoint a receiver, as in the case of *Law* vs. *Ford*, 2 *Paige*, 310, and although a similar course may be proper when all the partners are dead, and there consequently is no one living upon whom the original confidence of the partners, *inter sese*, can have devolved, yet I am fully convinced that no case or *dictum* can be found in which, in a proceeding against a surviving partner by the representatives of the deceased, the court has appointed a receiver, without being satisfied, by the mismanagement or improper conduct of the surviving partner, that the confidence reposed in him was misplaced. The authorities already referred to, establish this proposition, in my opinion, very clearly, and are in nowise contravened by the cases of *Wilson* vs. *Greenwood*, 1 *Swanst*, 481, and *Harding* vs. *Glover*, 18 *Ves.*, 281. Indeed, in the last case, Lord Eldon expressly disavows the principle that the court will, as of course, appoint a receiver upon the mere ground of the dissolution of the partnership, and says there must be some breach of duty, or of the contract of partnership.

The present, then, being the case of a bill filed by the representatives of a deceased against a surviving partner, the fate of the motion for a receiver must depend upon the result of the attempt upon the part of the complainants to convict the defendant of improper conduct in the management of the business of winding up the affairs of the concern.

There can be no doubt that upon the dissolution of this partnership by the death of the senior partner, that it was the duty of the survivor thenceforth to cease altogether from carrying on the trade or business in which the parties had been before engaged. His authority from the period of the death of the deceased partner was limited to winding up and settling the affairs of the partnership, to which end he was authorized to receive the debts due to, and apply the partnership assets and effects in discharge of the debts and other obligations due by it. If he passed beyond this boundary, and undertook thereafter to carry on the partnership trade or business, or engage in new transactions, contracts or liabilities, on account thereof, it was an abuse for which the court might be justified in appointing a receiver. *Story on Part.*, secs. 322, 342, 343, 344. But is there in this case any satisfactory evidence of such misconduct ? The bill charges various acts of misconduct, but those are all denied by the answer except two, which are explained and justified. It is to be recollected in this case, that the connection in business between the deceased and the surviving partner, commenced as far back as the year 1829, and continued uninterruptedly from that time to the death of the elder Mr. House, in the month of January of the present year. Though the firm had changed twice during the period by the introduction or retiring of other parties, the relation between these parties remained unbroken during this long period. It is true, it appears, that on or about the 1st of January, 1847, the elder House fell into a state of mental and bodily infirmity which incapacitated him from that time to his death from attending to his affairs, but from the year 1829 to 1847, a period of eighteen years, there is nothing to show that he was not in the full possession of his faculties of mind and body, and that he did not give every necessary and proper attention to his business.

The present bill was filed on the 1st of May, 1848, and seeks, upon allegations of misconduct and abuse against the defendant, to show that a confidence confirmed and reposed by a connection of eighteen years duration, was misplaced and that the party in whom it was confided is unworthy to be entrusted with the performance of those duties which the law devolves upon him. I have remarked that all the acts charged against the defendant, in the bill, and which are alleged to be in violation of his duty as the surviving partner, are denied, except two, in regard to which an explanation is offered. But it is by no means certain that the answer admits more than one act which did not fall strictly within the limits of his duty. It was unquestionably the right and the duty of the defendant, as surviving partner, to collect the assets of the firm, and apply them in discharge of its obligations, and it is certainly very far from being apparent, that in that part of his answer in which he speaks of the amount of the debts of the firm, which he has paid in the interval between the death of the senior partner to the time of filing the bill in this case, he means to be understood as saying he has done more than this.

It is true, he says, the amount thus paid very much exceeded the sums received from collections and sales, and that he was compelled to resort to the aid of loans, and to his private resources, but it by no means follows that these loans were effected upon the partnership responsibility, or that any new obligation or contract binding upon the partnership was created. It does not appear, in fact, that any new obligations were issued in the name of the partnership growing out of the transactions of which I am now speaking, and even if such was the case, as the dissolution by death puts an end to a partnership from the time of the occurrence of that event, whether known or unknown, or whether third persons have or have not notice thereof, such new obligations bearing the partnership signature, would not be binding upon the firm, but only upon the surviving partner who signed them. But conceding the firm would be bound, still, as according to the answer, the money raised in this way was applied in extinguishment of claims against

the firm created prior to the dissolution, it might be very fairly insisted that it is not the creation of a new obligation at all, the person to whom the new obligation is given being substituted for, and simply standing in the shoes of the old creditor whose debt is discharged.

The allegation of the bill is, that defendant has been using the name of the firm for his own use and benefit, and has sold large amounts of the property of said concern without accounting therefor. These allegations are by the answer emphatically denied.

There is, however, one allegation of the bill, in which the surviving partner is charged with acts not warranted by his duty, which is, to a certain extent, admitted by the answer, though an explanation of it is offered, which, in my judgment, disarms the charge of much of its point. The bill alleges that notwithstanding the firm was dissolved by the death of Samuel, the surviving partner has gone on and made purchases of lumber, for which he has given the notes of the firm, and mixed said lumber with the lumber of the firm. The answer, whilst it denies the mingling of the newly purchased lumber with the stock of the firm, and whilst it states that the lumber so bought was kept separate from, and sold, and entered in the books, so as to distinguish the proceeds of its sales from the proceeds of sales of the old stock, does, nevertheless, admit the fact that such purchases to a small amount were made, and the notes of the firm given for them. The amount of lumber so purchased was less than four hundred dollars, and as the answer states, was required to keep up an assortment, and aid in the sales of the stock on hand at the time of the dissolution of the partnership, and the answer also states that the parties to whom the notes were given, knew of the death of Samuel House, (though this, as we have seen, is immaterial,) and that the surviving partner was alone responsible.

I cannot bring myself to think that an act like this, designed and perhaps well calculated to aid in winding up the affairs of the firm advantageously, and which the defendant says, in his answer, shall not be repeated, can subject him to the charge of

improper conduct, and show that he cannot be safely entrusted with the joint estate. And unless this is satisfactorily established, the court, according to *Mr. Gow*, will not exercise its power and appoint a receiver to collect in, and dispose of, the property. *Gow*, 382.

But although, according to the authorities, the legal title in the property of the partnership, in the event of the death of one survives to the others, the beneficial interest does not so survive, and it is the duty of the survivors within a reasonable time to settle up the business and account with the executor of the deceased for such interest, and if they fail to do so, a court of equity will grant an injunction restraining them from disposing of the joint stock and from receiving the outstanding debts. *Gow*, 378, *Story on Part.*, sec. 322, *note* 1. And the executor has a right to insist that the value of the property of the firm shall be ascertained in the way in which it can be best ascertained, by a sale. The surviving partners have no right to take the whole property, do what they please with it, and settle with the executor upon a calculated value. *Crawshay* vs. *Collins*, 15 *Ves.*, 218, 226; *Story on Part.*, sec. 322, *note* 1. The defendant in his answer expresses the opinion that the stock of this partnership can be disposed of at private sale most advantageously, but at the same time declares his willingness, if the administrator of the deceased partner desires it, and the court so direct, to sell the whole at public sale.

Samuel House, the deceased partner, died in the month of January of the present year, and the bill in this case was filed on the first of this month, being but four months from the death of the deceased partner. It is quite clear, therefore, that a reasonable time has not been allowed for adjusting the business of the concern, and on that ground, there is no foundation for the interposition of the court in the form in which its power is invoked. And as the charge of insolvency against the surviving partner is most explicitly denied by the answer, it is impossible to say that there will be danger in confiding to him the management of the joint estate, which the law confessedly devolves upon him.

4*

I am, therefore, of opinion, that the motion for a receiver must be disallowed.

———

[An order was then passed overruling the motion for a receiver. A motion was then made by the defendant to dissolve the injunction granted upon the original bill. Upon the hearing of which, the Chancellor delivered the following opinion on the 26th of June, 1848. Proof was also taken prior to the hearing of this motion, the purport of which sufficiently appears in the Chancellor's opinion.]

———

THE CHANCELLOR:

After hearing the argument of counsel, the court is about to dispose of the motion to dissolve the injunction heretofore granted in this case.

The bill which prayed for an injunction prayed also for the appointment of a receiver, and the propriety of the observation made in the argument, that the injunction should not be continued unless a receiver is appointed, is apparent. The injunction was ordered as a temporary measure to preserve the property from the waste with which, according to the bill, it was threatened, until the application for the receiver could be heard, and for obvious reasons its continuance must depend upon the fate of this latter application. To allow the injunction to stand without appointing an agent to collect the debts due the partnership, dispose of its property, pay its obligations and wind up its affairs, would be injurious to the interests of all parties and an abuse of the power of this court. In effect, therefore, this motion involves the question of appointing a receiver and every consideration which could influence the mind of the court upon a motion having that direct object in view must be weighed upon this occasion.

The court has already expressed an opinion upon the propriety of appointing a receiver on the bill, answer and exhibit, and that opinion was adverse to the application. And upon a careful re-examination of the reasons which brought me to the conclusion then formed, I have found nothing to make me dissatisfied with

it. It appears to me, then, and does now, that every allegation in the bill upon which, according to the established doctrine of this court, the propriety of appointing a receiver rests, was neutralized by the answer, and consequently, that, I should be interfering with the legal title, and wresting from the surviving partner the right which the law devolves upon him, without any evidence of a breach of duty or of the contract of partnership on his part.

The question, therefore, now to be considered is, whether there is in the evidence any thing which will justify the court in continuing this injunction, involving as its continuance does, the appointment of a receiver?

It was observed by the counsel who concluded for the plaintiffs, that, inasmuch as the defendant had expressed his willingness to sell immediately the remaining stock of the firm, if the court should direct it, it was a mere question whether this sale should be made by the agent of this court, who would be required to give security, or by the defendant who gives none. This view of the question appears to me to be too narrow. The appointment of a receiver does not merely carry with it an authority to sell the remaining stock of the firm, but confers the general power to take possession of its books, papers and effects, to receive its outstanding debts and wind up its affairs. It completely displaces and supersedes the authority of the surviving partner, putting the agent of this court in his shoes, and clothing him under its supervision with all the rights and duties which the law confided to the surviving partner. The management of his own interest in the concern, be it great or small, is taken from him and lodged elsewhere, and probably in hands not having the advantage of his skill and experience.

It seems to me that to give to an offer such as is contained in this answer, dictated as it manifestly was by a willingness on the part of the defendant to submit himself unreservedly to the authority of the court, and to comply with the wishes of his adversary, the effect contended for would be to pervert it to a purpose never contemplated, and, under the circumstances, unjust.

It is true, that this partnership is dissolved by the death of one of the partners and that nothing remains but to wind up its affairs, and, therefore, no weight is to be attached to the argument that the appointment of a receiver will break up the business. The business, except for the purpose of settling up the affairs of the firm is broken up by the death of the senior partner, and I am not restrained from appointing a receiver because such appointment will bring the affairs of the firm to a close.

The objection to the motion is, that here is a party who by law is entitled to retain possession of the partnership effects and wind up its business. *Egberts* vs. *Wood*, 3 *Paige*, 517 ; *Collyer*, 63, *note* 1. A party between whom and the deceased there existed a confidence, the benefit of which devolves upon the survivor upon the death of his associate. *Philips* vs. *Atkinson*, 2 *Brown's Ch. Rep.*, 272 ; *Daniel's Ch. Pr.*, 1969. The court, in my opinion, has no right to take from the surviving partner the power resulting from that position, unless a case is made out showing that the interests of other parties are in danger from the continued exertion of the power. Show that the survivor has been guilty of a breach of duty, or of the contract and partnership, that he is wasting the funds of the firm, and the court will be prompt to interfere for the protection of the estate of the deceased partner by the appointment of a receiver. *Higginson* vs. *Air*, 1 *Desaussure*, 429.

In this case the amended bill, in order to show that the interest of the representatives of the deceased partner were in peril, alleges, though not in very specific terms, the insolvency of the defendant. This allegation, however, is swept away by the explicit denial of the answer, and there is not only no proof, but no attempt has been made to prove the truth of the allegation. The case is consequently to be regarded as if no such averment had been made, and it remains to be considered whether any other facts are alleged and proved, upon which this court can with propriety take the settlement of the affairs of this partnership from the hands of the surviving partner.

The attempt to create distrust in his integrity by the allega-

tions, and the effort to establish by proof, that he had covered up deficiencies in the cash means of the firm by forced entries in the books, has signally failed, it appearing upon examination, that so far from deficiencies in the cash being concealed by such means, surpluses to a considerable amount have been disclosed, which, but for the entries in question, might never have seen the light. The effect of these entries as explained by the witnesses, and indeed as is apparent upon their face, was to increase the funds of the firm, and of course to benefit the partnership. The defendant if dishonest, might have put the money in his pocket, or applied it to his individual use, but knowing it to have been derived from the sales of the property of the firm, or from collections, or however derived, to belong to the partnership, he made such entries in the books as the occasion required.

It is insisted that the necessity for these entries betrays a want of skill and care in the management of the business which should predispose the court to appoint an agent to take charge of it. Entries of the character referred to, have certainly an appearance of negligence, and may indicate a want of skill, but the manner in which the business was conducted, is supposed to relieve the defendant from a part, at least, of the imputation which might, under different circumstances, attach to him. It appears that various agents were employed in selling lumber, and the entries in the books were made from the reports of these agents, and it is quite as likely that these agents neglected to report sales, or the receipt of cash, as that being reported the book-keeper omitted to make the proper entry. At all events, the fact of the subsequent entries having the effect to benefit the firm, and in a corresponding degree prejudicing the defendant as an individual, rescues the transaction from the injurious interpretation which might otherwise be put upon it. It is more than probable, that he might have appropriated these excesses of cash to his own use without detection, and that he did not do so, but by proper entries in the books threw them into the general funds of the firm for the benefit of the partners, cannot be allowed to impair the confidence which the deceased partner so

long reposed in him, and to which he is consequently entitled in the eye of this court.

The next transaction relied upon to justify the appointment of another person to wind up the affairs of this partnership, has regard to the stock alleged to be held by the firm in what is called the Baltimore Eagle Works, and the proof of Mr. Gist.

It is said by the defendant, that an inspection of the books will entirely and satisfactorily explain this transaction, and will show that this stock was not partnership property, but the property of the individual partners. The complainant's counsel resists the right of the defendant to refer to the books for this purpose, upon the ground that those books were not filed in the cause as evidence, but were merely brought in by the defendant to be made evidence if the plaintiff chose to do so. Without considering this question at this time, and conceding that the transaction in relation to the stock in question requires explanation, I do not think it can have the conclusive effect imputed to it, and that all the consequences of a fraudulent concealment of property are to be visited upon the defendant. It is to be recollected that in the paper maked exhibit A, which purports to be a full statement of the funds and property of the firm, an interest in or claim against this company is set down among the assets, thus directly inviting the attention of the complainants to it. Now is it reasonable to suppose if the fraud imputed to the defendant was contemplated by him, that he would have put the opposite party upon the track, by pursuing which, exposure was inevitable. It is true, such fatuity is sometimes seen in the affairs of life, and frauds apparently shrouded in impenetrable mystery are brought to light by conduct wholly irreconcilable with the cunning with which they were perpetrated. But still it cannot be denied that this pointing the adverse party to the source from which the fraud, if committed, might readily be detected, is a circumstance from which a presumption favorable to the defendant should be drawn.

One of the arguments principally relied upon to show a want of capacity or integrity on the part of the defendant, and that consequently he is unfit to be trusted to wind up this partner-

ship, is founded upon the supposed discrepancies in the statements furnished by him to the complainants of its condition. It is alleged that he has given statements professing to show the indebtedness of the firm, which, whether from design or carelessness, are so grossly inaccurate that no confidence can be reposed in him.

It appears that very shortly after the death of Samuel House, Sr., the complainant, Walker, called on the defendant for a statement of the condition of the partnership, and upon being informed that it would not just then be very convenient to furnish it, he said he would be satisfied with a rough statement. Upon this a statement was made out, professing to give the amount of claims against the firm up to the 1st of January, 1848, the period of the death of Samuel House. According to this statement, which gives the names of the creditors in initials, the indebtedness of the firm amounted to $31,681 38. This statement, which is filed as an exhibit with the bill and marked C., being, as alleged in the answer, found to be inaccurate, owing to the cause therein assigned, another paper was prepared and marked as defendant's exhibit, W. A. H., No. 2, giving a list of other claims against the firm up to the same date, to wit, the 1st of January, 1848, amounting to $8,334 61, making an aggregate of indebtedness of $40,015 99. Subsequently, about the 12th of April last, the defendant gave the complainant another statement of the indebtedness of the firm, in which the names in full of the creditors are given, and amounting to $31,255 92. In this statement, filed as exhibit (B.) with the bill, are many items of indebtedness not to be found in either of the other statements, and it is contended by complainant's counsel that the items not so embraced in the previous statements are distinct and independent debts, and show the firm to be indebted to an amount greatly exceeding the first representation of its condition.

It is stated in the answer of the defendant in the reply to an interrogatory of the bill, and appears by his exhibit, W. A. H., No. 5, that the sums paid by the defendant since the death of Samuel House, up to the 3d May last, amounted to $27,775 35,

and that to enable him to do this he was compelled to borrow, in various modes and from various persons, upon his own personal credit, nearly $15,000. The receipts from partnership assets and the cash on hand at the death of Samuel House being only $13,383 34. Hence it follows that though the creditors of the firm have been paid to an amount exceeding $27,000, this has been accomplished, if the answer and exhibits are to be relied upon, upon the individual credit of the surviving partner to the amount stated above, and that he, in respect of these advances, was entitled to be substituted as a creditor of the firm in the place of the original creditors who had been paid by means raised upon his credit.

When comparing the statement of the debts of the firm which have been paid by the defendant with the papers marked C. and W. A. H., No. 2, it will be found that a very large amount of the claims embraced in these two papers have been paid, and consequently when the statement of the liabilities of the firm marked (B.) was prepared on the 12th of April last, the names of the creditors whose claims were embraced in the previous statements, and who had been paid, do not appear. But the paper marked B., although it did not contain the names of the creditors mentioned in paper C .and W. A. H., No. 2, who had been in the interval, between the 1st of January and the 12th of April last, does, as is alleged in the answer, contain the names of those parties from whom the defendant had borrowed the means to pay claims against the firm so much exceeding the amount which had been realized from its assets. If this statement is true, and the exhibits filed with the answer and the proof of O'Donnell support it, then the items of indebtedness embraced in exhibit (B.) and which are not to be found in exhibits C. and .W. A. H., No. 2, are not new and distinct items of indebtedness, but these new creditors whose names are contained in exhibit (B.) merely take the place of the old creditors whose claims were paid by means procured from them. There was some irregularity, it is true, in putting down the names of the parties from whom the defendant had borrowed money and notes, as creditors of the firm. They were in truth creditors of the sur-

viving partner, but as the latter upon settling the affairs of the partnership would be entitled to be reimbursed for his advances to pay its debts, the actual condition of the concern was correctly stated. The answer, as it seems to me, explains this matter satisfactorily, and all its statements in this respect are fully sustained by O'Donnell the clerk.

Upon a careful examination of the various exhibits filed with the answer which were prepared, as it appears, to meet the several and special interrogatories of the bill, it will be found, I think, that they support the statements of the answer with regard to the condition of the firm. It would be tedious to go through them in detail, and I content myself, therefore, by saying, that I can find nothing in them calculated to make an impression unfavorable to the integrity of the defendant, or upon which I can say the confidence reposed in him by the deceased partner was misplaced.

A good deal has been said about the manner in which the books were kept, and the neglect to subject them to the test of periodical settlements and balances. Upon this part of the case, however, it must be recollected that the deceased partner could not have been ignorant of this omission. The partnership had existed for many years, and during the whole period, except the last year of his life, the deceased is conceded to have been an active, energetic and intelligent man of business. It is impossible to suppose that he did not know how the books were kept, and now after his death to urge a defect in this particular, with which he must have been familiar, and to which he must be presumed to have given his assent, as a reason for withdrawing confidence from the surviving partner does appear to me to be rather a rigorous measure of justice.

Seeing then that the charge of insolvency as made in the amended bill is entirely overthrown by the answer, and that no attempt has been made to establish it by proof, and being by no means satisfied that any improper conduct has been fastened upon the defendant, or that he has shown himself unfit to be entrusted with winding up the affairs of this firm, a duty and a right which the law confers upon him, the prohibitory process

of this court interposed as a measure of precaution must be withdrawn.

To leave the injunction in force and appoint a receiver to settle up the affairs of this partnership, without showing the existence of one or the other of these causes for such interposition, would be to establish a principle which might make this court the manager of half the partnerships in the state, a result which, in the former order, was shown to be deprecated by a distinguished Chancellor of the parent country.

[In the course of the subsequent proceedings in the cause, a decree was passed for an account and referring the case to a special Auditor for the purpose of stating the account from the pleadings and proofs in the case, the books of the firm and such other proof as the parties may produce before him upon giving the usual notice. The decree also directed that before he should proceed to act as Auditor in the case, he should make oath before some justice of the peace that he will well and faithfully execute the duties of his said office as Auditor in this case without favor, affection, partiality or prejudice.

Upon the coming in of his report, various exceptions were filed to it by the defendant. Among others that it states the Auditor's fee at the amount of $863 33, which the exceptant charges to be enormous, unreasonable and excessive. The character of the other exceptions sufficiently appears from the following opinion of the Chancellor delivered at the hearing thereof.]

THE CHANCELLOR:

This case is brought before the court and has been argued by counsel upon exceptions to the report of the special Auditor, and the several accounts accompanying the same, filed on the 24th of April, 1849.

The decree for an account passed on the 1st of August, 1848, by which the special Auditor was appointed, as is usual, directed that he should, before proceeding to act, make oath that he would

well and faithfully execute the duties of the office conferred upon him. His report does not inform the court whether he did or did not do so, and the defendant has made this apparent omission to qualify, the ground of a special exception, and there can be no doubt that unless the Auditor did take the oath required by the order appointing him, that his proceedings were wholly irregular, and the accounts stated by him, unless this objection be waived, cannot furnish the foundation of a decree.

With this remark, the case as it now stands, might be disposed of, but in order to facilitate the future progress of the cause, I shall proceed very briefly to notice some of the exceptions to the report.

The defendant's first exception is directed against the discrimination which the Auditor has made in his account A., which is a copy or abstract of the balance sheet of the firm, and in which he places the assets in distinct columns, designating a portion as doubtful and others simply as "assets" without designation.

The exception insists that many of the claims ranged under the head of "assets," are in fact doubtful or not likely to be recovered. The Auditor, in a paper filed on the 18th of January, 1850, verified by his affidavit, states that this discrimination was made upon information derived from the defendant himself. But this statement of the Auditor cannot certainly be received as evidence, being *ex parte*, and not warranted by the terms of the order under which he was acting, which required that proof should be taken on *notice* to the parties.

The court could not, therefore, undertake to charge the defendant with the amount of assets placed in the column designated simply as such, nor can any settlement of the partnership accounts be made upon such basis.

[Other exceptions, which are not deemed material to be reported, were then considered by the Chancellor and sustained. As to the objection to the Auditor's fee, the following are the remarks of the Chancellor.]

The 25th exception objects to the amount of fees claimed by the special Auditor for preparing and stating the accounts.

The Auditor states that he was engaged in the work 186 days, which at the rate of charge allowed by law, amounts to the sum claimed.

I do not propose now to decide finally upon this exception. I am not aware that any case has ever occurred before in the court in which the fees of the Auditor amounted to so large a sum, and I shall, therefore, leave the point open for explanation and proof on both sides.

It was observed in the course of the argument that the defendant was not consulted, and indeed had no notice, that the appointment of a special Auditor would be applied for, or who would be nominated, until after the decree of the 1st of August had passed.

The Chancellor was under a different impression, but in consideration of the statement now made by the defendant's solicitor, and without in the slightest degree intimating that the appointment was an injudicious or improper one, the case will not now be sent back to the same Auditor, it being deemed best to give the parties an opportunity of presenting their views upon the subject.

A reasonable time will be allowed for that purpose, after which an order will be passed, giving such directions for stating the accounts as the present condition of the cause may seem to justify.

PRATT and GLENN, for Complainants.
WILLIAMS and SCHLEY, for Defendants.