## PAINTER et al. v. PAINTER et al.

### No. 15,310; May 25, 1894.

#### 36 Pac. 865.

**Partnership Accounting.—Upon the Death of One Partner** the business was carried on for a number of years by the survivor. In a suit for an accounting and the appointment of a receiver, it appeared that the books contained many errors and erasures. Many of these errors compensated each other. The same method of bookkeeping was pursued, and the same irregularities were found, both before and after the deceased partner's death. Many of the more serious irregularities were explained. The books had been kept continuously by the same bookkeeper, who testified that he had never made a fraudulent entry. Held, not to sustain a finding of fraud.

**Partnership Accounting.—Where a Surviving Partner has Conducted** the business for six years to the advantage of all parties concerned, a decree declaring all the assets to belong to the old firm, and refusing to allow such partner any compensation for his services, or even credit for amounts paid a manager of the business, is erroneous.[1]

---

[1] Cited in the note in 112 Am. St. Rep. 844, on right of surviving partner to compensation.

Cited in Harrah v. Dyer (Ind.), 96 N. E. 44, where the court says: "As indicated, the decisions are at variance on this question, the general rule being that in the absence of contract, the surviving partner will not be allowed compensation where the settlement simply involves the sale and collection of the partnership assets and payment

**Partnership Accounting.—In a Suit Against a Surviving Partner** for an accounting, a credit to him on account of real estate appeared in the ledger, written over an erasure under date of February 28, 1882. An expert witness surmised that the entry was made in 1883, after the death of plaintiff's decedent, and fraudulently antedated, as he saw nothing on the face of the books to justify the entry. Defendant's account-book, kept as one of the books of the firm, contained entries justifying the credit, and the item appeared properly entered in the journal between entries unquestionably made in 1882. Defendant testified, corroborated by vouchers and his account-book, that he took land in his name for the firm; that the payments were made by the firm, though charged to him, and the credit was made by the consent of his partner to balance his account. Held, insufficient to sustain a finding that the entry was fraudulent and void.

**Partnership Accounting.—One Partner Advanced Money to the Firm,** and permitted his copartner to withdraw it for his individual use. The latter died without having returned the money. Thereafter, an action was brought by his personal representatives against the surviving partner for an accounting. Held, that the claim need not be presented for allowance against the estate of the deceased partner, but would be adjusted by charging plaintiffs therewith on the partnership accounting.

**Partnership—Receivership After Death of Partner.—The** control of firm assets and business should not be wrested from the surviving partner, by the appointment of a receiver, without a clear showing of mismanagement or improper conduct, and of danger of ultimate loss to the estate of the deceased partner.

APPEAL from Superior Court, City and County of San Francisco; F. W. Lawlor, Judge.

Action by Caroline A. Painter and E. B. Dallam, executors of the will of Jerome B. Painter, deceased, against Theodore P. Painter and J. Milton Painter, for an accounting. From

---

of the liabilities; but where the services are in excess of a mere winding up of partnership affairs, a different rule applies."

Cited and followed in Rowell v. Rowell, 122 Wis. 15, 99 N. W. 477, the court saying, "The next general proposition on which the judgment rests is that, since the partnership assets were in legal effect not sold to the new concern, but nevertheless were appropriated and used by it in operating its business, they must be deemed to have entered into that business as capital, and that any profits earned are to be attributed to such assets according to their value, to the same extent as to the money capital contributed by John S. Rowell (the surviving partner)."

a judgment for plaintiffs and an order denying a new trial defendants appeal. Reversed.

Pringle, Hayne & Boyd for appellants; Fox, Kellogg & King (P. T. Riley of counsel) for respondents.

VANCLIEF, C.—This is an action by the executors of the will of Jerome B. Painter, deceased, to compel an accounting and settlement of the affairs of the partnership firm of Painter & Co., of which the deceased was a member and Theodore P. Painter was the surviving partner.

The business of the partnership was that of manufacturing and selling printing-presses, type and other materials, and the publication of an annual directory, and other incidental business. The partnership was originally formed in 1859, when it was composed of the three brothers—Jerome B., J. Milton, and Theodore P. Painter, of whom Jerome B., the deceased, was the eldest and Theodore P. the youngest. J. Milton ceased to be a member of the firm October 1, 1865, from which date until the death of Jerome, February 6, 1883, the eldest and youngest brothers continued to be equal partners. During the partnership the firm acquired considerable real estate, a portion of which stood in the joint names of the partners and a portion in the separate name of each partner. By the will of Jerome B. all his share in the partnership stock and goodwill of the business, except the real estate, was devised to his brothers, J. Milton and Theodore P., upon the condition of their assuming the partnership liabilities. Shortly after the death of Jerome, Theodore, the surviving partner, formed a new copartnership for the same purposes with J. Milton, without changing the firm name; and on December 3, 1884, they filed a certificate of their partnership, under the firm name of Painter & Co., as having existed since February 12, 1883. Before entering upon the business of the new firm, they took an account and inventory of the stock on hand, which was reported to the appraisers of the estate of Jerome B. Painter. All stock on hand was then marked so as to distinguish it from any additional stock they might acquire, and all sales of that stock were thereafter distinguished on the sales-books from the sales of other stock. The books of original entry, cash-book and journal used by the old firm were used by the

new firm, and were kept by the same bookkeeper, George W. Darbey, who had kept the books of the old firm for more than six years prior to the death of Jerome B. Painter. By order of J. Milton, posting of the old firm books was discontinued until it was discovered that they had not been fully posted prior to the death of Jerome, when directions were given to complete the posting of them. No posting of the accounts of the new firm nor of sales of the stock of the old firm was done for a period of about four years; but proper data for future posting were kept in the books of original entry, cash-book and journal. Only one cash account was kept, but the sales-book clearly distinguished the sales of the old stock from the sales of new. J. Milton was the manager of the business, but made no charge against the old firm for his services or for services of the new firm for selling the old stock, nor for collecting the debts due the old firm. The continuance of the business by the new firm facilitated, to some extent, the winding up of the old business. New machinery was purchased by the new firm for the manufacturing department; and the manufacture and sale of new stock, and the continuance of a general sale department, helped the gradual disposition of the old stock at less expense and sacrifice than probably would have been incurred by putting it upon the market at once, and separately from a general business and assortment of goods in that line. In 1878 the old firm entered into an agreement with Francis & Valentine, H. E. Langley, and others for the purpose of the copyrights and privileges of "Langley's San Francisco Directory," and certain other directories, and of the goodwill of the business of publishing the same, and agreed to publish the same annually for a period of ten years, and to pay to Francis & Valentine twenty per cent of the value of all copies sold—equivalent to a royalty of one dollar per volume—and providing that "in case of the death of either of the partners composing the firm, as it then existed, the surviving partner and the estate of such deceased partner shall have the right of abandoning the publication of the aforementioned works," and of being discharged from future liability, upon reassignment of the copyright and goodwill of the business. Up to the death of Jerome B., February 6, 1883, the publication of the directories had been made at a continual loss to the firm, and the publication for the year

1883 caused a loss of $1,200. The surviving partner, Theodore P., who was also one of the executors of the will of Jerome B., proposed to abandon the business of publishing the directories, as unprofitable, and spoke of the matter to Mr. Dallam, a coexecutor, who interposed no objection; but J. Milton Painter was of opinion that the future publication of the San Francisco directory might be made profitable, if they could secure more favorable terms from Francis & Valentine; and it was concluded to make another attempt, on the condition that the new firm should act on their own responsibility, and at their own expense. As a result of the efforts of J. Milton Painter, the contract with Francis & Valentine was modified so as to reduce their royalty on the San Francisco directory to fifty cents per volume. J. Milton then introduced a change of management, by which the publication of that directory became profitable. In November, 1886, the contract was further modified so as to constitute a partnership between the new firm of Painter & Co. and the firm of Francis & Valentine, for the publication of the San Francisco directory on the basis of sharing equally the profits and losses, but the publication was to be under the supervision of Painter & Co. After the year 1883 the plant of type, stands and cases used by the old firm of Painter & Co. was used by the new firm in the publication of the directory, without formal transfer to the new firm; but all money required to be advanced for the publication for each year thereafter was advanced by the new firm, and a yearly rental of $300 was allowed as compensation for the use of the plant. The accounts of the directory concern were kept upon the books of the old firm by the same bookkeeper, without change in the manner of keeping them. The only means of discriminating between the old and new accounts consisted of the dates of the entries, and the essential nature of the business of publishing a new directory for each succeeding year. All accounts in regard to the directory, pertaining to the business of the old and new firms were entered continuously upon the same books, in the same firm name, of Painter & Co.

In the year 1884 litigation arose between the surviving partner of the old firm and the estate of Jerome B. Painter, deceased, growing out of an attempt of the surviving partner to enforce a debit to the account of Jerome B. as a claim

against his estate, though his net interest in the firm assets had been appraised at $4,152.94. This attempt of the surviving partner was defeated by a decision of this court in January, 1886: 68 Cal. 395, 9 Pac. 450. In May, 1888, the surviving partner, having resigned his position as executor, brought suit to settle the old partnership and to sell the real and personal assets of that firm; and, in October of that year, J. Milton Painter brought suit to obtain a construction of the will of Jerome B. Painter, and to marshal the assets of the firm and of the estate of the deceased partner. In May, 1889, the present suit was brought, the complaint in which charges, in substance, that upon the death of Jerome B. Painter, the surviving partner, Theodore P. Painter, took possession of all the property and business of the firm, and admitted the defendant J. Milton to an interest in the business; that defendants have ever since conducted the business as if it had been their own; that Theodore P. was both surviving partner of the old firm and one of the executors of the will of the deceased partner; that he has neglected and refused to settle the affairs of the partnership; that, by order of the probate court, he has filed a report and account in that court, wherein he falsely claimed that at the time of the death of Jerome B. he was indebted to the firm in the sum of $44,000 and upward, which indebtedness, on September 10, 1888, had increased to $73,000, whereas, on the contrary, the partnership was indebted to him, at the time of his death, in the sum of $50,000 at least; that the said report and account filed were insufficient and unintelligible, as well as false and fraudulent; that the probate court appointed an expert to examine the books, and state an account of the condition of the affairs of the partnership, who has been engaged in that work for several months, but is unable to state the account, for the reason that defendants have not, for many years past, kept any true or intelligible account of the business of the partnership; that, since the death of Jerome B., Theodore P. has altered and falsified the accounts of both himself and Jerome B., and made many new, false and fraudulent entries in the books, with intent to cheat and defraud the estate of Jerome B.; that he has collected large sums of money on account of the firm, amounting to at least $20,000, which he has not accounted for, but has appropriated to his own use; that he has so managed the

business as to lose, in a large degree, the goodwill of the business; that the books have not been posted since April, 1885; that false and fraudulent balances have been carried forward in the cash-book, showing the balance of cash on hand to be far below what it really was; that there would be due to the firm about May 16, 1889, the sum of $16,000, on account of the printing of the San Francisco directory, which money is and will be the property of the firm, and would be lost to the firm if paid to the defendants; that the estate of Jerome B. Painter cannot be closed without a settlement of the partnership; and that unless all the books, papers, vouchers, properties and assets of the firm are taken from the hands of the defendants, into the custody and control of the court, there is imminent danger that the interest of the estate of Jerome B. Painter in the property of the firm will be entirely lost. The prayer of the complaint is for the appointment of a receiver, and for an accounting and settlement of the partnership. The answer denies each allegation of fraud, and all danger of loss to the estate of Jerome B. Painter. It claims that the money received, and to be received, from the publication of the directory is no part of the assets of the firm of which Jerome B. Painter was a member. It avers that the keeping of the books was intrusted wholly to George W. Darbey, the same bookkeeper who was originally employed by Jerome B. Painter, and they were kept in the same style and manner after as before his death; that no false or fraudulent entries were made in the books at any time, and no irregularity appears on the books, since the death of Jerome B. Painter, which has not a precedent and example in the books as previously kept by Darbey; that the omission of posting in the ledger was through a misunderstanding on his part of instructions given him. It sets forth the efforts made by the surviving partner to liquidate the business of the firm of which Jerome B. Painter, deceased, was a member, and the pendency of the action brought by the surviving partner, May 4, 1888, to settle the partnership. The court appointed a receiver, who took possession of the whole of the type-foundry business, merchandise, and personal property on hand, of every description, and the whole of the directory business, and moneys arising therefrom, to the exclusion of both of the defendants. The findings were in favor of the plaintiffs upon every issue, in-

cluding all of the averments of fraud; and, as the result of
an accounting of the whole business from 1880, the court
adjudged that Theodore P. Painter was indebted to the firm
of Painter & Co. in the sum of $28,675.64, one-half of which
was declared a lien, in favor of the estate of Jerome B. Painter,
upon Theodore P. Painter's half of the assets of the firm, and
further adjudged that the defendant J. Milton Painter had
no interest in any of the assets of the firm, including the prop-
erty in the hands of the receiver, all of which was adjudged
to be firm assets. The defendants moved for a new trial,
alleging the insufficiency of the evidence to sustain the find-
ings of the court; and this appeal is from the judgment, and
from an order denying their motion for a new trial.

1. The evidence is insufficient to sustain the findings in re-
gard to the alleged fraud of the defendants. Those findings
are based upon the surmises of Mr. Folger, an expert wit-
ness, that various irregularities and erasures found in the
books, and certain entries, of which the explanation was not
obvious upon inspection, were indicative of fraud. These sur-
mises were natural, as appears from the testimony of Mr. Van
Bokkelen, another expert witness, who states "that while, on
the preliminary examination of the books of Painter & Co.,
the irregularities found by him made a very unfavorable im-
pression, yet on a more careful examination of such irregu-
larities and errors, and the discovery of the explanation of
the more serious of them, and the examination of the methods
of bookkeeping for several years prior to the death of said
Jerome, in which the same irregularities and errors occur, he
is now satisfied that those errors and irregularities, with at-
tending circumstances, exclude the idea of fraud." If the
record did not afford the means of testing the relative value
of the opinions of Mr. Folger and Mr. Van Bokkelen, the case
might be considered as one of conflicting evidence; but from
the facts, figures, and circumstances found in the record, all
supporting Mr. Van Bokkelen's theory, I think Mr. Folger's
unsupported opinion does not create a substantial conflict,
and is too slight and uncertain to justify a finding of fraud:
Code Civ. Proc., sec. 1835; Estate of Carpenter, 94 Cal.
411–419, 29 Pac. 1101; People v. Stewart, 80 Cal. 131, 22 Pac.
124. The evidence discloses a careless habit of bookkeeping
by Darbey, and it is somewhat surprising that his services were

retained, not only during the last six years of the life of Jerome B. Painter, and by the new firm of Painter & Co. until the appointment of the receiver, in 1889, but also by the receiver himself, from the date of his appointment to the time of the trial, in 1892, notwithstanding the fact that the affidavit on which the receiver was appointed disclosed the principal irregularities appearing in the books kept by Darbey. The evidence shows, and it is not disputed, that Darbey kept the books in the same careless and bungling manner from the beginning to the end of his services to the two firms of Painter & Co., but does not sufficiently show that either he or any of his employers were at any time guilty of fraud, or that any fraudulent entries were made in the books, or that any entries were fraudulently omitted, though the books contain many mistakes and erasures, and the vouchers show that entries were carelessly omitted. It appears that during the lifetime of Jerome B. Painter he was the managing member of the firm. He had kept the books for a time, and always had more immediate supervision of the books and accounts than had Theodore, who was a printer, and had never studied bookkeeping, either practically or theoretically, and seldom examined the books, further than to see that certain entries were made in which he had an interest. After the death of Jerome B. Painter, no entry appears to have been made in any book by Theodore P. Painter or J. Milton Painter; but all entries were made in the handwriting of Darbey, who testifies that he never made a fraudulent entry in the books. Yet the evidence establishes that during the lifetime of Jerome B. Painter, as well as subsequent to his death, there were many irregularities, consisting of mistaken entries made on the wrong side of the accounts, with many erasures and corrections of mistakes in the cash account, and careless omission of entries and postings. The books abound with so many of these errors throughout the service of Darbey as bookkeeper, many of which compensate each other, that it cannot be supposed that they were fraudulently designed. None of them, when viewed in the light of all the circumstances in proof, is inconsistent with innocent design, and it follows that none of them should be considered as fraudulently designed. Fraud should never be presumed, nor grounded upon mere suspicion, nor inferred from circumstances which are susceptible

of an explanation consistent with innocent intention: Estate of Carpenter, 94 Cal. 411, 412, 29 Pac. 1101; Estate of Kidder, 66 Cal. 490, 6 Pac. 326; United States v. Arredondo, 6 Pet. (U. S.) 716, 8 L. Ed. 557; Tucker v. Moreland, 10 Pet. (U. S.) 78, 9 L. Ed. 345; Paxton v. Boyce, 1 Tex. 317–325; Steele v. Kinkle, 3 Ala. 358.

2. The court erred in finding and adjudging that the whole of the assets taken from the possession of the defendants by the receiver were the assets of the old firm of Painter & Co., and at the same time refusing to allow any compensation to either of the defendants for their labor, skill and energy in the conduct of the business for six years, and charging Theodore P. Painter with all the funds drawn by J. Milton Painter for his support during that period, while acting as manager of the new firm. He drew funds for his support at the rate of about $116 per month, aggregating during the six years the sum of $8,372.54, all of which Theodore P. Painter is made to pay out of his own pocket, without deduction or allowance of any compensation for the services of J. Milton Painter. J. Milton Painter was treated by the court, in all respects, as a mere intruder in the business of the old firm of Painter & Co., and as if he were a mere private employee of Theodore P. Painter, payment for whose services could not be charged to the old firm by the surviving partner. Such a ruling is manifestly unjust, and contravenes the principles of equity. It is true that a surviving partner is not entitled to compensation for the mere winding up of the business of the firm. "But the rule applies merely to the simple and immediate winding up, by collecting the assets, paying the debts, and accounting for the surplus, as is necessarily involved in the creation of a partnership, and implied in the contract; but for time, skill and trouble expended beyond this, and inuring to the general benefit, the reason of the rule fails, as where, after dissolution, a partner successfully continues the business of the firm, using the original capital, goodwill, or other assets, and a benefit is received from his efforts, he is allowed to deduct from the profits a compensation, varying according to the state of the accounts, the nature of the business, the difficulty and results of the undertaking, and, perhaps, its necessity or desirability. The most usual application of the limitation of this principle is in the case of a surviving partner

continuing the firm business or completing the enterprise of the partners'': 2 Bates on Partnership, sec. 773. This court has said: ''When the partnership has been carried on for some time after a dissolution by death, and such continuance has proved beneficial to the parties, it is but just and proper that the surviving partner should receive a reasonable allowance for his skill and industry in conducting the business; for during that time the business has not received the care and labor of the deceased partner, as an equivalent for such services. While all the parties are living, each is under obligation to devote his time and services to the partnership business, and there is therefore good reason for holding that neither should receive a compensation for such services. But when, in consequence of the death of one partner, this equality no longer exists, it is but equitable that the surviving partner should be compensated for such services as he may have rendered in the business after the death of the deceased partner, to be deducted out of the profits realized by the continuance of the business, and the overplus of such profits, after deducting such compensation, to be divided between the partners: Story on Partnership, sec. 343, and notes; Collier on Partnership, sec. 328; Gow on Partnership, 354. We do not wish to be understood, however, as holding that the surviving partner is entitled to compensation merely for services rendered in winding up the affairs of the firm (Beatty v. Wray, 19 Pa. 516), but to confine it to a case like the present, where the partnership business has been continued for a considerable period in order that the affairs of the partnership may be advantageously wound up'': Griggs v. Clark, 23 Cal. 427, 430. Where a surviving partner, who has continued the business to advantage, is ordered to account, he should be allowed all expenses incurred · in continuing the business: O'Reilly v. Brady, 28 Ala. 530; Calvert v. Miller, 94 N. C. 600. And in the present case, upon the theory that the whole business conducted by the defendants should be regarded as if continued by the surviving partner for the benefit of the old firm, a reasonable compensation for the services of J. Milton Painter, as manager of the continued business, should be allowed as an expense incurred in continuing the business, in addition to a reasonable compensation for the services of the surviving partner. Where a partner forms a subpartnership with a

third person, who becomes manager of the firm business, such manager not being a partner of the other partner, is entitled to compensation, as against him: Newland v. Tate, 3 Ired. Eq. (N. C.) 226. But it is by no means clear that the court was justified in ordering an accounting of the whole of the business conducted by the new firm of Painter & Co., and in taking into its custody all of the assets claimed by that firm. It is true that, as a general rule, an accounting of profits will be ordered against a surviving partner who conducts the business after dissolution, with the use of the firm assets. ''But if, from the nature of the concern, and the state of the accounts, the assets cannot be realized, except by continuing business, and the surviving partners continue as a new firm, debiting themselves with old assets, they are not accountable for profits'': 2 Bates on Partnership, sec. 794. ''Just allowances to the continuing partners are always made, and if the main contribution to subsequent success is the skill, time and diligence of each partner, it is difficult or impossible to say how much of the profits is to be allowed for or deducted for the services of incoming new partners; and, if an accountability for profits would be unjust, the court may allow interest only'': Id., sec. 797. The rule for an accounting of profits ''being founded on the misuse of another's property, held for other purposes only, and on its exposure to risks, the share of profits to be accounted for is measured by the amount attributable to that source. Hence, if the subsequent profits are partly or wholly due to the skill of the remaining partners, a special inquiry is necessary to ascertain the amount. No general rule can be made'': Id., sec. 797. There should be no accounting for subsequent profits where the deceased partner owes the firm more than the amount of his interest in the business of the firm, and the subsequent profits arise from the prudence, skill and industry of the remaining partners: Id., sec. 798, and cases cited.

The case at bar seems to be a proper one for a special inquiry. According to the theory of the evidence contended for by the appellants, viz., that Jerome B. Painter bought all of the school lands purchased by him on his own private account, as his property, and that they are not assets of the partnership, and that Theodore P. Painter is entitled to all the credits of which he has been deprived by the findings and decree

of the court, Jerome B. Painter might prove to be indebted to the firm, at the time of his death, beyond the actual value of his interest in the personal assets of the firm at that date, the actual value of which does not now certainly appear.   If that theory were sustained, as the result of a new trial, his estate would not be entitled to share at all in the profits of the business conducted by the new firm.   But, in determining the assets of the firm at the date of his death, the value of the goodwill of the business must be taken into the account; and it should be ascertained by special inquiry what was the precise value of the interest of Jerome B. Painter in the personal assets of the firm, including the goodwill, at the date of his death, and to what extent his interest in the assets was employed by the new firm in the conduct of their business. To the proportionate extent to which his interest in the goodwill and personal assets of the old firm was actually used by the firm in the prosecution of its business, his estate ought, in equity, to participate in the profits realized by the new firm. On the other hand, to the full extent of the interest of Theodore P. Painter in the assets of the old firm, as a partner therein, and of all moneys advanced by the members of the new firm, either individually or upon their joint credit, and to the extent of their purchase of new machinery and new merchandise with their own funds, and to the extent of the value of their personal services, skill and energy employed in the business of the new firm, it is equitable and just that the new firm should receive its proportionate share of the profits realized from the new business.   In estimating the value of the goodwill of the old firm, it should be considered that, while the old firm had the right to continue the publication of the directory, it was not under contract obligation to do so after the death of Jerome B. Painter, and that the original contract, as made by the old firm, had proved unprofitable, and that the profits subsequently realized were owing to modification of the contract secured by J. Milton Painter, and largely owing to his management of the business.   It should also be considered, as matter of law, that no directory to be published after the death of Jerome B. Painter could have been copyrighted in advance of its publication, so that such copyrights could not be the property of the old firm.   The question to be determined in this connection is merely as to

what was the actual value of the goodwill of the directory business, considered as a part of the goodwill of the whole of the firm business, when the new business was inaugurated by the new partners under the old firm name.

3. The evidence is insufficient to justify the finding that the entry of a credit to Theodore P. Painter on the books of the old firm, of the sum of $15,203.19, on account of real estate and interest, was fraudulent and void, and that that amount was properly chargeable against him. The entry is written in the ledger over an erasure at the top of a column under date of February 28, 1882, and the expert witness, Mr. Folger, surmised that the entry was made February 28, 1883, after the death of Jerome B. Painter, and was fraudulently antedated; and, as he saw nothing on the face of the books to justify the entry, he thought that that amount should be charged back to Theodore P. Painter. But he admits that he did not examine the private account-book of Theodore P. Painter, which was kept in the handwriting of Darbey, as one of the books of the firm, which, as the expert witness Van Bokkelen clearly shows, contained entries of sundry amounts paid by him on account of real estate and interest, which correspond with and justify the entry of $15,203.19 made to his credit in 1882. The narrative of Theodore P. Painter, which is corroborated by his account-book and the vouchers produced in evidence, is to the effect that B. C. Vandall was indebted to the firm of Painter & Co. in a large sum of money, and having no assets other than heavily encumbered real property at South San Francisco, which might have a prospective value, but then had no value beyond the amount of the encumbrances thereon, proposed to transfer it to the firm, subject to the encumbrances. Jerome Painter endeavored to have the title taken in the name of a third person, as he did not wish to have Vandall ask the firm for more money in case the land should rise in value, but, failing to secure such third person, requested Theodore P. Painter to take the deed of the land in his name. The property thus standing in the name of Theodore, the payments from the firm money made by him to pay off the encumbrances were entered by the bookkeeper upon Theodore's cash account; and the entry of $15,203.19 to his credit upon the journal and ledger in 1882 was of an amount then calculated by the bookkeeper to correspond with the prin-

cipal and interest with which Theodore had been charged, and was entered upon the books at Theodore's request, in accordance with a tag showing the amount calculated by the bookkeeper, which he obtained from Jerome B. Painter. The entry upon the journal is without erasure, under a page bearing date March 31, 1882, but following an entry carried over from the previous page under date of February 28, 1882; it being the custom of the bookkeeper to make his journal entries as of the last day of each month. Immediately following the journal entry of this credit is a debit to the Boston & Fairhaven Iron Company, which the press copy of letters shows must have been entered in March, 1882, and was correctly posted as an entry of March 31, 1882. The credit of T. P. Painter was posted in the ledger under date of February 28, 1882. The amount of interest entered in the journal as part of the credit was calculated by Darbey only to February 1, 1882. The erasure over which the posting was made in the ledger is fully accounted for by a previous mistaken entry of a debit balance of December 31, 1880, which was commenced to be carried to the wrong side of the page, and erased by the bookkeeper, as was his custom in cases of such mistakes, which were comparatively frequent. One of the expert witnesses testified that he had discovered that the word ''balance'' had been originally written under the entry of this credit in the ledger, and erased; and in the photographic copy of the ledger page, appearing in the transcript, the top of what might be the letters ''B'' and ''I'' are plainly visible, and it is apparent that the date of 1880, originally written above the mistaken entry of the debit balance, was changed to 1882—the date of the posting of the credit. The testimony clearly establishes that it was a common mistake of the bookkeeper to commence to place an entry at the beginning of a column of figures in the wrong column, and to correct it by an erasure, sometimes making the correction before he had finished the incorrect entry. Such mistakes and erasures abound in the ledger, but it is noticeable that no erasures of importance appear in the journal, or in the books of original entry; and none appear in the journal entry of this credit, which stands properly between entries which were unmistakably made in 1882—prior to the death of Jerome B. Painter. It is not necessary to review in detail all of the evidence bearing upon

the subject matter of this credit. It has been carefully considered, and it is sufficient to say that, taken as a whole, in view of the well-settled presumption against fraud, it does not sustain the finding that this credit was fraudulent, but does tend to establish, on the contrary, that it was made in the lifetime of Jerome B. Painter, with his knowledge and consent, and was made on account of real estate belonging to the firm. If so, it was improperly charged back against Theodore P. Painter in the accounting between him and the estate of Jerome B. Painter.

4. The same is true of a credit to Theodore P. Painter of $4,282.98 on account of stock of the South San Francisco Dock Company, entered under date of June 30, 1882. The journal entry of that date appears to be regular, and refers by names and numbers to the certificates of stock for which the credit was given, and is immediately followed by another journal entry of the same date, of interest due the Bank of British North America for the month of June, 1882. No erasure appears in the posting of this entry. This stock was obtained from B. C. Vandall on account of a debt to the firm, and was redeemed and held in the name of Theodore P. Painter for the firm, in the same manner as the land deeded by Vandall to him. Theodore P. Painter testified that this entry was also made, with the consent and knowledge of Jerome B. Painter, at the date of the entry appearing on the books, and there is no proof to the contrary. Before making the entry, Darbey made a calculation of the principal and interest to June 19, 1882, but made a mistake against Theodore P. Painter of $1,000 in the calculation, thus attaining the precise sum entered upon the books to his credit. Under this state of the evidence, this credit was improperly rejected by the court, and the amount improperly charged back to Theodore P. Painter in the accounting.

5. The court also improperly rejected a credit to Theodore P. Painter of $1,961.87, entered on the journal March 31, 1882, and posted as of that date, on account of money advanced to F. P. Thompson, and interest thereon, in consideration of the note of F. P. Thompson, executed to the firm of Painter & Co. on the 29th of January, 1878, payable March 1, 1878. This note was drawn in the handwriting of Jerome B. Painter. Theodore P. Painter testified that F. P. Thompson was super-

intendent of state printing, and requested a loan from Painter & Co., and that Jerome B. Painter agreed to the loan, but did not want it to appear upon the books of the company, and requested him to draw the money in several sums, on his private account, and loan it to Mr. Thompson upon his note payable to the firm.  The note was not paid, and was about to outlaw in March, 1882, when the amount advanced, with interest, was credited to Theodore, with the knowledge and consent of Jerome.  There is nothing to contradict this explanation of the matter.  The account-book of Theodore P. Painter, kept by Darbey, shows that in January, 1878, unusually large sums of money, amounting to more than enough to cover the amount of the loan from the firm to Thompson, were charged to Theodore P. Painter, as having been drawn by him from the funds of the firm.  Darbey's recollection is that the note was about to outlaw when this credit to Theodore was entered, which would correspond to the date of the credit in March, 1882. It appears that, for some unexplained reason, interest on the money advanced by Theodore P. Painter was calculated to the 18th of April, 1882; but such a calculation would evidently not have been made if the entry were antedated after the death of Jerome B. Painter, in 1883.  That it was not so antedated further appears from the journal entry immediately following the credit of $1,961.87, which is proved by the invoice-book to have been entered in March, 1882.

6. Theodore P. Painter is also improperly charged with $7,312.48, being the whole of the credit side of a branch account kept by him upon the books of Painter & Co., entitled "Mrs. M. B. Account."  "Mrs. M. B." was the mother of the Painters, and Theodore used her initials, in her lifetime, to designate an account of moneys received by him from her as a gift, and also moneys received by him from other friends, which he advanced to the partnership.  This account was in fact a separate branch of the account of T. P. Painter with the firm of Painter & Co.  But it is evident that, if the items of this account had been entered upon the account kept in the name of Theodore P. Painter, the credit side of the Mrs. M. B. account would have appeared upon the credit side of his own account.  No justification is apparent for debiting Theodore P. Painter, individually, with the whole of the credit side of this account.  If it were shown that there were any

improper items of credit in the account, they should, of course, be deducted therefrom. So, also, any improper items of debit should be corrected. But Theodore P. Painter should be credited, instead of charged, with any true balance of credit to the Mrs. M. B. account. The balance of credit appearing upon the face of the account is $6,508.15. Items of credit amounting to $2,477.33, consisting of $2,000, principal, received by Jerome B. Painter from Theodore P. Painter March 5, 1881, and interest on that amount, in the sum of $477.33, from that date until February 28, 1883—the date of the entry of these items of credits—are controverted, as having been improperly entered after the death of Jerome B. Painter, without any corresponding money appearing upon the books to have been paid into the account, or to have been received by Jerome B. Painter. Theodore P. Painter testifies in regard to this entry that just before the first Monday in March, 1881, at Jerome B. Painter's request, he withdrew from the bank $2,320 of the money due to this account. This amount appears on the face of the account to have been charged to the Mrs. M. B. account, March 5, 1881, as drawn by T. P. Painter individually; and the remaining $2,000 was deposited in the office of the firm, and was used by Jerome B. Painter personally, under a promise to replace it. He put off adjusting the matter, but finally promised to pay the money on the 20th of February, 1883, but died on the sixth day of that month, without having done so. After his death, Theodore P. Painter, by the advice of his attorney, Judge Cope, had the entry in question made upon the books to the credit of the M. B. account, under date of February 28, 1883. The claim for the adjustment of this matter appears to have been made in good faith, and to have been immediately announced to his coexecutors, who agreed that that sum should be paid. It also appears that in the months of March and April, 1881, the cash account of Jerome B. Painter showed few and small charges to him, indicating that he then had some other source of supply of funds. Under these circumstances, it would seem that the entry of the credit to the Mrs. M. B. account was justifiable, and should not be charged back to Theodore P. Painter. But the entry made by the bookkeeper was an incomplete adjustment of the matter, for the manifest reason that Jerome B. Painter, having actually received the money drawn from this account, which was

deposited in the office of the firm by Theodore P. Painter at his request, should also be charged therewith. The credit to the Mrs. M. B. account appears, in itself, a proper manner of canceling the debit made to that account on March 5, 1881, when the money was merely drawn by Theodore P. Painter from the bank at the request of Jerome B. Painter, and deposited in the office of the firm. It must be regarded, therefore, as remaining in the custody of the firm until taken therefrom by Jerome B. Painter, whose account ought to be charged therewith, as an asset of the firm, instead of the account of Theodore P. Painter, while the firm liability would still remain to return the money to Theodore P. Painter through the Mrs. M. B. account. For these reasons the credit to that account should stand, and the account of Jerome B. Painter should be charged correspondingly. The same result would have been reached by the payment of the money and interest out of Jerome B. Painter's estate to Theodore P. Painter individually; but that estate is in court, and as the matter can properly be adjusted through the medium of the partnership accounting, I think it should be adjusted in the manner indicated. A surviving partner is not required to present a claim against the estate of a deceased partner, who has received money from the custody of the firm, or which constitutes, legally or equitably, a part of its assets, if the claim can be worked out through the settlement of the partnership: Manuel v. Escolle, 65 Cal. 110, 3 Pac. 411; Painter v. Painter, 68 Cal. 395, 9 Pac. 450. The mere fact that the entry of the credit to the Mrs. M. B. account was made upon the firm books after the death of Jerome B. Painter is not material, there being sufficient proof aliunde to justify the credit. The respondents have not contradicted the sworn statement of Theodore P. Painter as to the claim made by him to them immediately after the death of Jerome B. Painter in reference to the. $2,000 received by Jerome B. Painter in March, 1881, and as to their agreement that it should be adjusted. That Jerome B. Painter had full confidence in the integrity of his brother Theodore is manifest from the terms of the will.

7. A charge of $349.52 is improperly made against Theodore P. Painter on account of payments made by him upon a firm note for $700, executed October 1, 1880, to Grace Meininger, payable one year after date, with interest at ten per

cent per annum, payable quarterly. It appears that the money loaned by her to the firm, for which this note was given, was entered upon the books of the firm as an account in her name. But on February 28, 1881, the money was drawn out, and divided between the partners, and the account closed, though the note was not taken up or paid. The payments subsequently made on the note by Theodore P. Painter were charged to him, individually, in the accounting, on account of the apparent squaring of her account upon the books. But the note remained unpaid, and was a subsisting obligation of the firm. It is clear that all payments made by Theodore P. Painter upon the Grace Meininger note, out of firm funds, during the existence of the note, as a firm obligation, are properly chargeable to the firm, and not to Theodore P. Painter individually.

8. Sundry credit items, appearing on the books as credited to Theodore P. Painter, amounting in the aggregate to $5,988.75 in May, 1889, have been erroneously charged to him by the court in the accounting. These credits were matters of offset to charges made by the bookkeeper to Theodore P. Painter of cash received from sales of merchandise, or from collections reported by him, which appear from the books to have been credited back to him when the money was paid in; and to charge them back to him again is manifestly unjust. These credit items, furthermore, relate largely, if not entirely, to the business of the new firm, and, in so far as they do so relate, their justice is matter of inquiry and adjustment between Theodore P. Painter and J. Milton Painter, as partners. There is no proof that Darbey, the bookkeeper, fraudulently entered these credits to the account of Theodore P. Painter, and there is proof that he had charged Theodore P. Painter, individually, with a corresponding amount of cash received, to which the credits apply when the cash was returned, and paid over by him to the firm.

9. On the face of the cash-book by Darbey, as bookkeeper, a total cash shortage of $17,432 appears to have occurred between June, 1881, and May, 1889, one-half of which ($8,656) has been charged to Theodore P. Painter in the accounting. A much larger amount of cash shortage appears on the face of the cash-books to have occurred under former bookkeepers in the lifetime of Jerome B. Painter, between 1871 and 1881.

The cash-books do not appear ever to have been kept in balance. The partners appear to have contented themselves with watching the actual cash receipts and disbursements, and seeing that proper entries were made upon their individual accounts and the accounts of the firm with third parties, without requiring the general cash account to be kept in accurate balance, or to correspond in balance with the balance of cash on hand. The proof is clear, from the examinations of many vouchers, that very many items of cash were not entered at all upon the general cash account. A sufficient number of these omissions were proved to reduce the apparent cash shortage by the amount of $5,722.69, and to make it evident that the apparent cash shortage was owing to a careless and slipshod manner of bookkeeping, especially as to entries upon the general cash account, which was never balanced, and not owing to any fraud, either on the part of the bookkeeper or of the members of the new firm, in their relation to each other, or in their relation to the old firm of Painter & Co. All entries made upon the books were made by the bookkeeper, Darbey, who was generally careless, and especially so in his posting of the general cash account, which was never balanced, or used by the partners, either of the old or new firm, as a criterion of the amount of cash which ought to be on hand. But Darbey is not convicted of dishonesty, and the manner in which he kept the general cash account goes far to acquit him of such a charge. Had he been dishonest, it is highly improbable that he would have kept that account in a condition to disclose a large cash shortage, for which the firm might call him to account. Indeed, it does not appear that Darbey ever handled any of the moneys of the firm, and it seems absurd to account for the cash shortage upon the supposition of his intentional dishonesty. Neither is there ground, from the evidence, for reasonable belief that either of the partners fraudulently directed the bookkeeper to make false entries in the general cash account, or to omit the making of other entries therein, so as to show, upon the face of the books, a cash shortage of many thousands of dollars. The court has erroneously credited Jerome B. Painter with one-half of the cash shortage of the old firm, which occurred under the administration of Darbey, as bookkeeper, during his lifetime. The evidence discloses that Jerome B. Painter was then the managing partner,

and carefully supervised the accounts of the firm, and controlled its receipts and expenditures, while Theodore P. Painter, the younger partner, was unacquainted with bookkeeping, and had nothing to do therewith, except to see that some entries were made, affecting his interest, under the supervision and with the consent of Jerome B. Painter. Clearly, if any account were to be made of cash shortage occurring under the management of Jerome B. Painter, the whole should be charged to him, instead of crediting him with one-half thereof. But, in view of the presumption against fraud on his part, the proper conclusion is that all apparent shortage in the cash account during his lifetime should be disregarded, and not treated as assets of the firm. The same bookkeeper was employed both by the old and new firm, and, for his loose habits and negligence, Jerome B. Painter was at least in pari delicto with his younger brothers, who were less experienced in bookkeeping, and less familiar with Darbey's methods: Hottel v. Mason, 16 Colo. 43, 26 Pac. 335; Barrett v. Kling (City Ct. Brook.) 16 N. Y. Supp. 92. But, as respects the apparent cash shortage in the accounts of the new firm of Painter & Co. since the death of Jerome B. Painter, if regarded at all, it should be considered as a matter to be adjudged between the members of the new firm, consisting of Theodore P. Painter and J. Milton Painter, and having occurred solely on account of that portion of new business in which the new firm alone is entitled to share. It is evident that all sales of merchandise belonging to the old firm are sufficiently distinguished by the entries in the sales-book to disclose what portion of the cash was received from those sales; and for all of that portion the new firm will be accountable to the old firm, regardless of any cash shortage in their general cash account. The same is true of all debts collected on account of the old firm, which must be accounted for in full. But in so far as the estate of Jerome B. Painter may be shown, upon a new accounting, to be entitled to share in the profits of the new business, on the ground of the employment of its assets therein, the apparent cash shortage should be disregarded, for reasons heretofore stated.

10. Appellants claim that an erroneous credit was allowed Jerome B. Painter on account of the purchase of school lands, which the court finds to be the property of the firm, but which

42

appellants claim were purchased by Jerome B. Painter on his own private account. The proof that he did purchase these lands on his own private account is conclusive, unless it can be held to be overcome by an entry which stood upon the firm books for a long time prior to the death of Jerome B. Painter. The written contract for the purchase of these lands was made with B. F. Mauldin by Jerome B. Painter individually; and the account of the purchases was kept in his private cash-book, and never at any time entered to his credit on the journal or ledger, as payments made by him on account of the firm. They were afterward entered upon the ledger simply as a "Land Account," containing a memorandum of the moneys paid, and interest thereon, but not describing any lands whatever. Theodore P. Painter, who was not accustomed to inspect the books as a whole, did not discover this ledger entry until long after it had been made, but, as soon as he did discover it, protested against it. He testifies to a conversation then had with the respondent Dallam, in which he complained of the entry, and denied that the firm had anything to do with those school lands, and that Dallam then advised him to complain to Jerome, and, if he would not correct the matter, to bring suit. This conversation is not denied by Dallam. Theodore testified that he then had a personal interview with Jerome, and complained of the ledger entry, and wanted it changed, reminding Jerome that he (Theodore) had refused to enter into the purchase of the school lands, to which Jerome replied: "O, well, that is all right. I just entered it there for the time being." He further testifies that: "No reference was made to the school lands after the conversation I just spoke of. That gave me to understand that they were not intended for the company. He said the equivalent of that." It appears that Theodore P. Painter has uniformly denied that the firm was interested in the purchase of these school lands, and that the respondents, as coexecutors of the will of Jerome B. Painter, treated the school lands as his individual property after his death. In view of the whole evidence upon the subject of the purchase of these school lands, and especially in view of the fact that Jerome B. Painter never demanded or received a credit upon his account with the firm on account of the cash paid for them, the finding that these lands were the property of the firm of Painter & Co., and that Jerome

B. Painter should be credited with their price in the accounting, is against the evidence. There is nothing but this ledger entry, against Theodore's protests, to connect the firm, in any manner, with the contract of purchase. The lands were paid for out of the private funds of Jerome, and were taken in his name; and there is no pretense that the original investment was on account of any business in which the firm had an interest, or was agreed upon, in its inception, by both partners. In this respect there is an essential difference between the purchase of the school lands in the name of Jerome, and the taking of the Vandall lands in the name of Theodore, on account of a firm transaction, at the suggestion of Jerome, for which Theodore received a credit upon the journal in 1882, with Jerome's consent, and by his order to the bookkeeper. On no tenable ground, so far as appears from the evidence, can the investment made by Jerome in these school lands be held to have been the original purchase of property by him on account of the firm, and on no principle of justice can Theodore be compelled to take or pay for one-half of these school lands. In view of the protest made by Theodore, he cannot be held estopped by the entry of the so-called "land account" upon the ledger of the firm.

11. Appellants have printed in the transcript the original order appointing the receiver, with the affidavit upon which the same was based, and also an order refusing to discharge the receiver, with the affidavit and counter-affidavits used thereupon; but there is no appeal from either of these orders, and the affidavits are not made part of the record by any bill of exceptions, and therefore the correctness of these rulings cannot be reviewed upon this appeal. But the court has incorporated in its findings a fact, presumably based upon the evidence in the record, "that there was at the commencement of this suit, and ever since has been, and still is, great and imminent danger that the interest of J. B. Painter, and of his heirs and devisees, in the property of said firm would be entirely lost, and that the appointment of a receiver herein heretofore, and at the commencement of this action, made by the court, was and is proper, necessary, and warranted in the premises." This finding is not sustained by the evidence adduced upon the trial of the cause; and the further finding that, "since the death of said Jerome B. Painter, said surviv-

ing partner has so managed the business that he has, in large degree, lost the goodwill thereof, and has virtually wrecked the said business,'' has no evidence to sustain it. The ex parte showing made at the appointment of the receiver may have been sufficient, prima facie, to justify the order; but the whole of the evidence adduced at the trial shows that the appointment of the receiver was in fact unjustifiable, or at least that his appointment should not have been continued after the trial. The rule is well settled that the surviving partner being the one in whom the deceased himself reposed confidence, and being in law entitled to the possession and control of the firm assets, control should not be wrested from him, by the appointment of a receiver, without a clear showing of mismanagement or improper conduct, and of the danger of ultimate loss to the estate of the deceased partner: Walker v. House, 4 Md. Ch. 39–44; High on Receivers, sec. 497; Bates on Partnership, secs. 993, 999; 17 Am. & Eng. Ency. of Law, p. 115. In view of all the evidence adduced at the trial, the receiver should have been discharged by the court. I think the judgment and the order denying a new trial should be reversed and a new trial granted, to be conducted in accordance with the principles stated in this opinion.

We concur: Searls, C.; Belcher, C.

PER CURIAM.—For the reasons given in the foregoing opinion, it is ordered that the order denying a new trial be reversed and a new trial granted, to be conducted in accordance with the principles stated in this opinion.