[No. 14744.   Department One. — April 30, 1892.]

## ESTATE OF CHARLES W. CARPENTER, DECEASED. ABEL F. CARPENTER ET AL., RESPONDENTS, *v.* C. K. BAILEY ET AL., APPELLANTS.

CONTEST OF WILL — DEVISE TO CHILDREN OF COPARTNER — FRAUD — UNDUE INFLUENCE — REPORT OF BAD TREATMENT BY RELATIVES OF TESTATOR. — Where a will, devising the bulk of the estate of the testator to the children of his copartner, who were upon intimate and friendly relations with the testator, who had declared his intention to make some of them the objects of his bounty, is contested by relatives living in another state, who were not provided for by the will, evidence that the father of the children stated to a witness that the testator had said he had been badly treated by his relatives, and would not give them any part of his property, without proof of the communication of the statement to the testator, does not prove that he fraudulently started or circulated the report, or suggested it to the disordered fancy of the testator, or show undue influence exercised by him over the mind of the testator, it appearing that some of the testator's witnesses testified to similar assertions by the testator which antedated the interview with the father of the devisees.

ID. — SUPPORT OF FAMILY BY PARTNERSHIP. — The support of the family of the copartner by the partnership of which the testator was a member, with his presumed knowledge and consent, would not constitute fraud, and if he were actually defrauded thereby, would not tend to induce a will in favor of the children of the copartner.

ID. — SUPPRESSION OF LETTERS FROM TESTATOR'S RELATIVES. — Where the suppression, by the copartner, of the letters of the testator from his relatives is not one of the charges specifically averred, and there is no proof that he received or suppressed them, beyond a suspicion that he might have done so, under the evidence of one of the testator's brothers as to the sending of certain letters, which were not returned from the dead-letter office or found among the testator's effects, such evidence does not prove fraud exercised by the copartner in the procuring of a will in favor of his children.

ID. — UNDUE INFLUENCE — DEGREE OF EVIDENCE REQUIRED — DESTRUCTION OF FREE AGENCY. — Slight evidence of undue influence is insufficient to establish it. The influence must amount to force and coercion, destroying free agency as to the very act, and the exertion of undue influence upon the very act must be proved.

ID. — INFLUENCE IN MANAGEMENT OF PARTNERSHIP. — The fact that his copartner had more influence than the testator in the management of the partnership business would not tend to prove that he influenced the testamentary disposition.

ID. — MENTAL INCOMPETENCY — INSANE DELUSION — SPECIAL VERDICT — SUPPORT OF ORDER VACATING PROBATE — REVIEW UPON APPEAL. — A special verdict showing that the deceased, at the time of making the will, was of unsound mind, and that he failed to make provision for the contestants by reason of an insane delusion, is sufficient to sustain an order vacating the probate of the will, and where there is some evidence

tending to support the verdict upon these issues, only errors of law in trying them can be considered upon appeal.

ID. — OPINION EVIDENCE AS TO MENTAL SANITY — "INTIMATE ACQUAINTANCE" — CONSTRUCTION OF CODE — DISCRETION. — Subdivision 10 of section 1870 of the Code of Civil Procedure, which makes competent "the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given," excludes such evidence by others than intimate acquaintances, who are, by unreserved intercourse, familiar with the varying moods and temperaments of the person whose soundness is questioned; but the statutory rule is necessarily more or less indefinite, and a large discretion must be conceded to the trial court, and if the conclusion reached is one that can be reasonably entertained consistently with the idea of intimacy of acquaintance, it will not be reviewed by the appellate court.

ID. — HYPOTHETICAL QUESTION TO MEDICAL EXPERT — ASSUMING FACT NOT IN EVIDENCE. — Where the only evidence as to the declarations of the testator about his sister is to the effect that "if he knew where his sister was, he would go and see her and visit her," a hypothetical question to a medical expert on the subject of mental sanity, in which it is assumed that he referred to a sister whom he knew to have been dead nearly thirty years, rather than to his living sister, should be disallowed.

ID. — INSTRUCTIONS AS TO VALUE OF EVIDENCE — MATTERS OF FACT — PROCESS OF REASONING. — Instructions as to the weight and value of evidence, stating what the jury are at liberty to conclude from certain facts, if found, involving a conclusion, not of law, but of the judging mind from the evidence, are in violation of the constitutional inhibition as to instructions upon matters of fact. The court has no right to dictate or even suggest the process of reasoning by which the evidence shall be judged.

ID. — MISTAKEN BELIEF AS TO MISTREATMENT OF RELATIVES — INSANE DELUSION — ERRONEOUS INSTRUCTION. — An instruction stating, in effect, that if the testator was mistaken in his belief that his relatives had mistreated him, and therefore made no provision for them, he was of unsound mind, is erroneous. The fact of such mistaken belief does not, as matter of law, amount to an insane delusion.

ID. — RADICAL CHANGE OF TESTATOR'S FEELINGS — CAUSE OF CHANGE — ERRONEOUS INSTRUCTION. — An instruction that if the jury find that the testator's feelings toward his relatives had undergone a radical change, they should inquire whether there was good reason for the change, but not limiting the inquiry to whether it was caused by an insane delusion, is erroneous. People may hate their relatives for bad reasons, and yet not be deprived of testamentary power.

ID. — WILLFUL SUPPRESSION OF EVIDENCE — INFERIOR EVIDENCE — PRESUMPTIONS — EXCLUSION OF EVIDENCE — INAPPLICABLE INSTRUCTIONS. — Instructions that "it is a presumption of law that evidence willfully suppressed would be adverse if produced," and that "it is a presumption of law that higher evidence would be adverse from inferior evidence being produced," should not be given, where no suppression of evidence or production of inferior evidence appears in proof; and the exclusion of the evidence of a physician, offered by the contestant of a will upon the condition of the testator's mind, upon objection of the pro-

ponents of the will, is not a suppression of evidence, or the withholding of higher evidence, warranting such instructions, but the rejection of such evidence as inadmissible renders the instructions prejudicially erroneous.

APPEAL from a judgment of the Superior Court of San Joaquin County, and from an order refusing a new trial.

The facts are stated in the opinion.

*Carter & Smith,* and *S. D. Woods,* for Appellants.

The appellate court will grant a new trial where it appears to a reasonable certainty that the verdict or decision was wrong upon the evidence. (Hayne on New Trial and Appeal, sec. 288; *People* v. *Hamilton,* 46 Cal. 541; *People* v. *Ardaga,* 51 Cal. 371; *Branson* v. *Caruthers,* 49 Cal. 381; *Guerrero* v. *Ballerino,* 48 Cal. 121; *Franklin* v. *Dorland,* 28 Cal. 178; 87 Am. Dec. 111; *Walsh* v. *Hill,* 41 Cal. 571.) A verdict of this kind should be instantly set aside. (*Pursley* v. *Hayes,* 22 Iowa, 11; 92 Am. Dec. 350.) The vice of the instruction in regard to the delusion of Carpenter consists in not qualifying the word "delusion" by the use of the word "insane." Nothing but an insane delusion will invalidate a will. (Beach on Wills, sec. 102; *American Seamen's Friend Society* v. *Hopper,* 33 N. Y. 619; *Hite* v. *Sims,* 94 Ind. 333.) Not only must the delusion be an insane one, but even an insane delusion is insufficient to defeat a will, unless its provisions be the direct offspring of the delusion. (*Hite* v. *Sims,* 94 Ind. 333; *Rice* v. *Rice,* 50 Mich. 448; *Coit* v. *Patchen,* 77 N. Y. 533.) The constraint which will avoid a will must be a present, constraining, and operative power upon the mind of the testator in the very act of making the testament. (*McMahon* v. *Ryan,* 20 Pa. St. 329; *Eckert* v. *Flowry,* 43 Pa. St. 46; *Chandler* v. *Ferris,* 1 Harr. (Del.) 454; *Goodwin* v. *Goodwin,* 59 Cal. 560.) We call the court's attention, in the matter of instructions, to the late case of *Haight* v. *Vallet,* 89 Cal. 245.

*L. W. Elliott*, and *A. H. Carpenter*, for Respondents.

There was no error in allowing Dr. Bulson to answer the hypothetical questions. The facts assumed to be true were in accordance with the evidence adduced. In propounding such questions, counsel are allowed considerable latitude, and are not confined to the facts actually established. (*Filer* v. *N. Y. C. R. R. Co.*, 49 N. Y. 46; 10 Am. Rep. 327; *Hovey* v. *Chase*, 52 Me. 304; 83 Am. Dec. 514; Lawson on Expert Evidence, rules 30, 42.)

TEMPLE, C. — This is a contest in regard to a will, inaugurated after the will had been probated, and is the second appeal taken by proponents. (79 Cal. 382.) It is from an order revoking the probate of the will, and from an order refusing a new trial.

There have been two trials, each before a jury, and twice the verdict has been to the effect that the decedent was of unsound mind, and that the will was the product of an insane delusion. On the last trial, special issues were submitted, and the jury not only found that the decedent was of unsound mind and under an insane delusion which caused him to make the will in question, but also that the will was procured by the fraud and undue influence of C. K. Bailey.

The contestants are three brothers of the deceased, a a sister, and the minor children of a deceased brother, all residents of the state of Vermont.

The beneficiaries in the will, who, by its terms, receive the bulk of the estate, are the children of C. K. Bailey. No relative is given anything by the terms of the will.

Carpenter was a native of Vermont, born about 1829. He left home when about twenty years of age, and is shown by the evidence to have been in California as early as 1853, where he had since continuously resided. He had never been back to visit his relatives, and none of them had ever visited him in this state. Some correspondence was kept up, however, as late as 1877.

The record discloses that in 1856 Carpenter was mining at Mokelumne Hill, and that C. K. Bailey was his

partner; also, that in 1863 he was ranching with Bailey as his partner. This partnership continued until Carpenter's death, January 2, 1884. Carpenter never married, but Bailey was a married man with a family of children, some of whom are the beneficiaries of the proposed will. I do not find their ages stated in the evidence, but it does appear that they grew up during the copartnership, and that the relation between them and Carpenter was intimate and friendly. There is abundant evidence of his attachment for them, and some expressions were those of his intention, long before his last sickness, to make some of them the objects of his testamentary bounty.

Correspondence was put in evidence between Carpenter and some of his relatives, mostly however of very old date, and with his father and mother, both of whom died before him, which seem to show a relation quite intimate and friendly.

Omitting formal parts, and condensing, the charges of fraud in the complaint are: 1. Bailey falsely represented to Carpenter that his relatives were all dead; 2. That upon the death of either, the property would be greatly depreciated unless kept together; 3. Bailey promised to make his will in favor of Carpenter, if Carpenter would make the will in question; and 4. Carpenter's sickness was not fatal, and Carpenter would probably survive Bailey, and his estate get the benefit of the proposed wills.

There is no evidence to support any of these specific charges, nor, so far as I can find, is there in the record any evidence tending to show fraud of any kind on the part of Bailey or any one else.

In response to a challenge from appellants, respondents state several matters which they claim constitute fraud.

1. Bailey circulated a report that Carpenter had been back East and had been badly treated by his relatives.

It is, to say the least, doubtful if there is any evidence tending to show that Bailey circulated such a report. The proof is, that a certain witness asked if Carpenter

had got back. Bailey said, "Yes"; and also stated, according to the witness, that he complained of the treatment he had received, and that he would not give his relatives any portion of his property. Some of the contestants' witnesses also state that they heard Carpenter make similar assertions.

The claim is, that Bailey started the report, thus suggesting it to Carpenter's disordered fancy.

There is no evidence that the alleged statement of Bailey was communicated to Carpenter, and the alleged assertions of Carpenter antedate this supposed interview with Bailey.

2. Bailey had a family, which were supported by the partnership. There is no evidence of this, but if true, it would not constitute fraud, for Carpenter must have known it, and consented to the arrangement. And if by it Carpenter were defrauded, that would have no tendency to induce him to make a will in favor of Bailey's children.

3. Bailey suppressed Carpenter's correspondence. The only evidence of this is, that one of Carpenter's brothers said he had written to him, and that some letters had been addressed to Bailey, but since 1877 had received no reply, nor had any of his letters been returned to him from the dead-letter office. No letters since 1877 were found among Carpenter's effects, and Carpenter is reported to have said on sundry occasions that he had written and had got no replies. There is no proof that Bailey received any of the letters, or that he was in the habit of going to the post-office for letters exclusively. Sometimes Bailey went to town to transact their business, and sometimes Carpenter did. Whether either, or who, was in the habit of going for their mail does not appear.

Such evidence, at the most, could do no more than raise a suspicion. Certainly it cannot be called proof. This is not one of the charges specifically averred.

The jury found that the will was procured to be made through fraud exercised by C. K. Bailey, or some

one at his instance and request.   This finding is wholly unsupported by the evidence.

The allegations of undue influence may be regarded as sufficient.   The special issue submitted to the jury was in two forms, in which, however, I see very little difference.

Was the will procured to be made through undue influence exercised by C. K. Bailey, or any one at his instance and request? and was it procured to be made in the form in which it was made by such influence? The jury found both issues in the affirmative.

Was there any evidence tending to support either of these findings?   I think not, or at least not more than "slight evidence."   (Code Civ. Proc., sec. 1835.)

This court held, in *Goodwin* v. *Goodwin*, 59 Cal. 560, following Jarman on Wills, that the influence must amount to force and coercion, destroying free agency as to the very *act*, and that the exertion of undue influence upon the very act must be proved.   There is no evidence tending to show that Bailey, or any member of his family, ever spoke to Carpenter about making a will, or about the disposition of his property, or in regard to his relatives, or that any one else, authorized or not, ever tried to influence Carpenter in regard to the disposition of his property, much less in favor of Bailey or his children.

Carpenter died from consumption.   His last illness was not at Bailey's house, and neither Bailey nor any member of his family attended him during his illness; on the contrary, Mrs. White, at whose house he was and by whom he was nursed, shows herself a warm partisan of the contestants.   She was one of the witnesses to the will, and says she thought at the time that it ought to be "bursted" because he gave nothing to his relatives. Challenged to find some evidence to support these special issues, respondents specify, — 1. Bailey's great influence over Carpenter during the latter years of his life; 2. His frequent visits to Carpenter during his last illness; 3. The importunities of Dr. Stockton, the attending physician, to make a will; 4. The reluctance of Carpenter

to make a will, shown by the fact that he did not make it at once when it was suggested; and 5. When Bailey was there at one time going over the accounts with Carpenter, they ceased talking when Mrs. White entered the room.

It is evident at once that there is nothing here that comes up to the rule laid down in *Goodwin* v. *Goodwin*, 59 Cal. 560. Conceding that it was proven that Bailey had more influence in the management of the partnership business, that would not tend to prove that he influenced the testamentary disposition. It is not shown that Dr. Stockton made any effort to influence Carpenter as to the character of his will, or ever mentioned Bailey or his children, or Carpenter's relations; in fact, all that is shown is, that Dr. Stockton made the very proper suggestion that he ought to make a will, and through him Carpenter sent for the attorney who drew it up. It does not appear that Bailey was acquainted with the attorney. The attorney testified that no one spoke to him about the contents of the will except Carpenter, who told him that he, Carpenter, had sent for him to prepare it.

The other specifications do not require refutation. There was really no proof to sustain the verdict in this respect.

The special verdict in regard to mental unsoundness, though stated in different ways, is really only that the deceased, at the time of making the will, was of unsound mind, and therefore incompetent to make a will; and if it may be classed under this head, that he failed to make provision for the contestants by reason of an insane delusion.

It was admitted that there was some evidence tending to support each of these findings, and the verdict upon these issues is sufficient to sustain the order vacating the probate of the will. The question therefore is, Does the record show such errors of law in the trial of these issues as will necessitate a new trial?

The allegation of mental incompetency was supported in a large degree by the opinions of witnesses claimed to be intimate as to his mental condition. Objection was

made in the case of each witness on the ground that the witness was not shown to be an intimate acquaintance within the meaning of subdivision 10 of section 1870 of the Code of Civil Procedure, which makes competent "the opinion of an intimate acquaintance respecting the mental sanity of a person, the reason for the opinion being given."

What is an intimate acquaintance has not been very clearly settled. The requirement that such an acquaintance shall be intimate acquaintance does not seem to exist elsewhere. In State v. Pike, 49 N. H. 399, Mr. Justice Doe, in a dissenting opinion, which has since been followed in that state, considers the question as to whether persons not experts can be allowed to testify in regard to mental sanity. He seems to assert that in England the rule has always been to receive such testimony, and he shows by numerous citations that such, too, has been the rule in most of the states. The witnesses are only required to have had sufficient opportunity to observe the person whose sanity is in question. Different rulings have been made as to what shall be considered a sufficient showing of opportunity of observation to enable a witness to form an opinion which can be received as evidence; or, expressed in the language of our code, what degree of intimacy there must be. In general, the idea seems to be, that no rule can be prescribed on this subject, and therefore, as in regard to handwriting, if it appear that there has been some opportunity, and the witness has an opinion, he may state it. The value of it will depend upon circumstances. In some states such evidence is not received at all from non-experts. Our code provides that intimate acquaintances may give their opinions, and, of course, the converse will follow that no others can. The phrase "intimate acquaintance" cannot include all acquaintances. Worcester, under the word "acquaintance," has the following: "Acquaintance expresses less than familiarity; familiarity less than intimacy. Acquaintance springs from occasional intercourse; familiarity

from daily intercourse; intimacy from unreserved intercourse. Acquaintance, having some knowledge; familiarity, from long habit; intimacy, by close connection."

In *People* v. *Levy*, 71 Cal. 618, it is said: " It is often a difficult question to determine whether the witness is sufficiently acquainted with the party to entitle him to speak. That the witness should be familiar with the temperament and habits of mind of the person whose soundness is in question there is no doubt." Sir John Nicholl, in *Kinleside* v. *Harrison*, 2 Phill. Ch. 449, says: " Persons who see a testator only occasionally will form different opinions from those who have better opportunities of judging; we know that little appearances occurring in this way are extremely fallacious, yet we often find occasional observers depose with great confidence. It often happens that the most ignorant are the most confident. . . . . This kind of opinion is still more various where the testator's capacity is fluctuating, where he is sometimes better and sometimes worse, and this is generally the case with old age or other infirmities."

An intimate acquaintance would appreciate these varying moods and temperaments, and be able to judge the acts of a testator with full knowledge of his peculiarities. A mere acquaintance who only casually meets one who has some infirmities, and, perhaps, also, some striking idiosyncracies, although quite often, and yet without special interest in him, might think strangely of conduct which to one better acquainted would seem rational and natural. No two persons are exactly alike, and many, in fact nearly every one, has some weakness which, perhaps like physical infirmities, they endeavor to favor or hide. Our thoughts run in different channels; our mental processes follow different methods. An intimate acquaintance who is familiar with all these can better judge of mental conditions.

Now, when we take into consideration the rule as it exists in most jurisdictions where the common law prevails, we must conclude that our code has attempted, what has been said to be impracticable, to establish a

rule as to what opportunities of observation shall entitle
a witness to speak. A non-expert may testify, but only
if he has had these advantages which I have attempted
briefly to specify, notwithstanding the statutory attempt.
Since it requires the drawing of a definite line between
things which are separated only by degrees of difference,
the rule is and must remain more or less indefinite. A
very large discretion must be conceded to the trial court.
If the conclusion reached is one which can be reason-
ably entertained, consistently with the above idea of
intimacy, this court cannot review the ruling.

Some of the witnesses who were allowed to give their
opinions as to the sanity of the deceased evidently were
not intimate acquaintances within this rule; and the
objection is not avoided by varying the form of the
question, — asking the witness how he appeared men-
tally. If anything, this adds to the objection, for it fails
to require the witness to give the reason for his belief.
There are, of course, some things which are not so
much matter of opinion as descriptive of appearances.
If one is a raving maniac, or dead drunk, or utterly un-
conscious, these are sometimes, at least, hardly matters
which require judgment, but only ordinary powers of
observation. As to such obvious appearances, I pre-
sume it was not intended that the rule should apply.
Evidence of this character is received even in these
jurisdictions which do not permit one not an expert to
give an opinion as to mental sanity. This was not the
character of the evidence received in this case.

As I think the case must be retried for other reasons,
it will not be necessary to review exceptions of this
character in detail.

The objection to the hypothetical question put to the
medical expert, in which it is assumed that when de-
ceased said he had a sister, and if he knew where she
lived he would visit her, he referred to a sister whom
he knew to have been dead for nearly thirty years,
rather than to his living sister, should have been sus-
tained. It is based upon the testimony of Drais, who

simply testified: "He said if he knew where his sister was, he would go and see her and visit her." There had been no mention of the dead sister, and nothing said by the witness indicates that she was thought of.

The other rulings as to the admission of evidence do not seem very material, and may not be repeate l at the trial.

The instructions are quite voluminous, and many of them have reference to supposed proof in regard to fraud and undue influence, upon which subject there was no evidence. They are also, many of them, as to the weight and value of evidence. An instruction which, commencing with an obvious fact prefaced with the remark " If you find," says, " You must then inquire whether so or so, and why, and if you find thus, you must or are at liberty to conclude thus," is an instruction as to the value of evidence. Take, for instance, the fourth instruction here given at the request of the respondents. In effect, it tells the jury that if Carpenter firmly and persistently believed that his relatives had mistreated him, and such belief was firm and immovable, and not based on fact, evidence, or probability, and was such as a rational man under like circumstances would not have had, he was, in the eyes of the law, suffering from an insane delusion. Now, it is quite common for people to be offended at imaginary injuries, to take offense when none was meant, to have a firm belief that they have been mistreated, not based on fact, and when the offending party would believe — for generally the baselessness of the belief could only be proven by them — that there was not even rational ground for such belief. But the chief objection to this is, that even if the logic be sound, it is not a conclusion of law, but of the judging mind from the evidence. The court has no right to dictate or suggest the process of reasoning by which the evidence shall be judged. Perhaps instructions of this character, though vicious and violative of the constitutional inhibition, have been often passed without condemnation, but if a party will ask the court to argue his case upon the evidence, he

should be held responsible for the soundness of the logic. In this case the appellants are as guilty in this regard as the respondents.

The second instruction, given at the instance of contestants, and to which objection is made, is as follows: "If Charles W. Carpenter, deceased, at the time of the execution of the alleged will, — if he did execute it, — was under a delusion this his relatives in the East had maltreated or abused him, and that under the influence of such delusion he made no provision in his alleged will for them, then, in the eyes of the law, he was of unsound mind, no matter how well he might transact his other business, or converse, nor how sane he was on matters in general, and you must so find."

Among other definitions of delusion given by Webster is: "2. The state of being deluded or misled; 3. That which is falsely or delusively believed or propogated; false belief; error."

The jury then are told that if Carpenter was mistaken in his belief, and therefore made no provision for his relatives, as matter of law he was of unsound mind. This cannot be so. There is evidence tending to show that Carpenter had for years, before any one thought him insane, said that he had been ill-used. Whether he was mistaken or not, the mere fact here recited did not, as matter of law, amount to an insane delusion. There was evidence tending to show that Carpenter thought he had been East from California and had then been ill-used, while admittedly he had not left California. This instruction does not necessarily allude to that alleged delusion. That is covered by other instructions.

The ninth instruction, given at the instance of contestants was, I think, erroneous, not for the alleged blunder which respondents think could do no harm, but among other reasons, because it tells the jury that if they find that Carpenter's feelings had undergone a radical change they should inquire whether there was good reason for the change. The only inquiry, as there was no evidence found, should have been whether it was caused by an

insane delusion.   Otherwise it did not concern this inquiry.   People may hate their relatives for bad reasons, and yet not be deprived of testamentary power.

The court also instructed the jury, at the instance of the plaintiffs, that " it is a presumption of law that evidence willfully suppressed would be adverse if produced."

I have examined the voluminous record in vain to find any evidence that there has been any suppression of evidence.   Respondents, in their brief here on this point, say that Dr. Stockton's testimony would naturally be considered the best evidence upon Carpenter's condition of mind, and that there was evidence that proponents would not use it; that they suppressed it by objecting to it when offered by contestants.

Of course this, if it occurred, was not a suppression of evidence, and it would be strange that the court, having decided that the evidence was not admissible, should, nevertheless, instruct the jury that the party offering it should have the benefit of a presumption that it was favorable, and that the other party, because he made a legal and proper objection, should thereby lay his case under the suspicion that he had been guilty of suppressing testimony.   The instruction would naturally have an injurious effect.

The same thing is true of the instruction: " It is a presumption of law that higher evidence would be adverse from inferior evidence being produced."

This was also evidently aimed at the objections to the testimony of Dr. Stockton, although the record does not show that any such evidence was offered.

I think the orders should be reversed, and a new trial had.

The COURT. — For the reasons given in the foregoing opinion, the orders appealed from are reversed, and a new trial ordered.

Hearing in Bank denied.