[Civ. No. 22919.   Second Dist., Div. Three.   Nov. 21, 1958.]

Estate of MAX GECHT, Deceased. MARTIN GECHT, Appellant, v. GOODWIN ANDERSON et al., Respondents.

Dolley, Jessen & Painter and Crowley, Sprecher & Barrett for Appellant.

Roland T. Williams, Fleming, Robbins & Tinsman, Clay Robbins, C. S. Tinsman and George I. Devor for Respondents.

PATROSSO, J. pro tem.*—This is an appeal from the order admitting to probate the will of the above named decedent over the opposition of contestant, the testator's son, who is the appellant here.

The grounds of contest were (1) lack of testamentary capacity (2) undue influence and (3) fraud practiced upon the testator by the principal beneficiary under the will, the testator's brother and the latter's son-in-law. The trial was a protracted one, the reporter's transcript comprising more than 2,700 pages in addition to which depositions of more than 1,000 pages and numerous exhibits were introduced in evidence. The trial court, sitting without a jury, found in favor of the proponents of the will upon all issues and the appellant contends that the findings with respect to testamentary capacity and undue influence are unsupported by the evidence.

The decedent left surviving him as his sole heirs-at-law his son, the appellant, and two daughters. By the terms of the will which was admitted to probate by the order here appealed from he disinherited all of his heirs and left the great bulk of his estate of an inventoried value of $429,500 to a brother, Abraham Gecht.

The decedent was a physician and the sole stockholder of Hillcrest Sanitarium, a corporation which operated a sanitarium at La Crescenta. The relationship between the decedent and the appellant was that normally existing between father and son but the decedent had been estranged from his two daughters for a number of years. The appellant had lived with his father from the time he was about 10 years of age, at which time his custody was awarded to the decedent upon the divorce of his parents and he continued to live with his father during his school and college days. Subsequently the appellant attended Chicago Medical School and was licensed to practice medicine in Illinois in 1945 and in conjunction with an associate, Dr. Starr, operated a medical clinic in that city. As indicative of the feeling existing between the decedent and the appellant it appears that during the years preceding the

*Assigned by Chairman of Judicial Council.

execution of the will here in question, the decedent had executed a number of wills in all of which the appellant was the principal beneficiary.

As early as June 1953, decedent was suffering from arteriosclerosis, coronary artery disease and diabetes mellitus. He then stated to the appellant that he had worked to establish the sanitarium for appellant's benefit and wanted him to take over the responsibility for its operation and management before the decedent was disabled from carrying on; that he did not care whether appellant leased or rented the sanitarium to others but that he would feel that all of his efforts had been wasted if the appellant and his children did not get the benefit to be derived from the operation of the sanitarium. In the same month the decedent talked to appellant's associate, Dr. Starr, along the same lines and requested that he and appellant take over the operation of the sanitarium. From this time on the decedent and appellant exchanged frequent communications by telephone and letter as well as personal interviews concerning the same subject. During the course of these decedent proposed that the appellant purchase the sanitarium for the sum of $25,000 in cash to pay all the unsecured obligations, but appellant stated he was unable to provide such a sum.

In the early part of July 1954, the decedent became seriously ill and requested appellant to assist him in arranging his affairs. At or about the same time decedent conferred with his counsel, Mr. Lippman, with respect to the lessees then operating the sanitarium and with whom the decedent was dissatisfied and instructed Mr. Lippman to advise the appellant that he could have the sanitarium without having to use any of his (appellant's) money. At the decedent's request Mr. Lippman prepared a memorandum outlining a plan for the transfer to appellant of the sanitarium and other properties belonging to the decedent. In this memorandum it was provided that the decedent would convey by way of a gift to the appellant 350 shares of capital stock of the sanitarium corporation of the stated value of $25,000; that appellant should purchase the remaining 351 shares of outstanding stock for the sum of $25,000 to be evidenced by a promissory note bearing interest at the rate of four per cent and payable in monthly installments over a period of 20 years, the note to be secured by a pledge of the 351 shares of stock; that the sanitarium corporation should execute a note to the decedent for the aggregate amount of the obligations owing by it to

the decedent, not exceeding $75,000, which note should bear interest at four per cent and be payable in monthly installments over a period of 20 years and to be secured by a deed of trust upon the sanitarium property; that the corporation should pay all outstanding indebtedness owing by the corporation to third persons, the decedent agreeing that all payments required to be made under the note to be executed in his favor by the corporation and secured by the trust deed previously mentioned were to be deferred until all of the corporation's unsecured obligations were fully discharged, and the appellant to agree not to withdraw any funds from the corporation till all the unsecured obligations had been discharged. It was further provided that the decedent, by way of gift, would transfer to the appellant two parcels of real property subject to a life estate in the decedent in one of said properties, which was the decedent's residence. Further, the decedent was to create an irrevocable trust, the corpus of which should consist of the note and pledge agreement of the appellant and the note and trust deed to be executed by the sanitarium corporation in favor of the decedent, the income from which trust should be paid to the decedent during his life and upon his death the income to be payable to the three children of the appellant with distribution of the corpus to them upon attaining the ages of 25, 30 and 35 years. Decedent was further to create a second trust, the corpus of which should consist of two other parcels of real property; the income from which was to be payable to the decedent during his life; upon his death to the decedent's housekeeper, Susan Collins, during her life and upon her death the corpus to be distributed to the appellant.

On July 27, 1954, the decedent was hospitalized with a condition subsequently diagnosed as myocardial infarction, the blocking off of a blood vessel. Upon learning of this appellant and his father-in-law, Mr. Heytow, flew to California and conferred at the hospital with the decedent and Mr. Lippman. The decedent then asked Mr. Lippman to leave the room and thereupon decedent showed the appellant and Mr. Heytow various bank books showing deposits in excess of $57,000, which fact he said he did not want Mr. Lippman to know for fear that he would charge too large a fee for his services. According to appellant's testimony decedent instructed appellant to withdraw the monies then on deposit in the various bank accounts and pay off all unsecured bills of the sanitarium and do whatever he liked with the balance. However,

as we shall see, the decedent later declared that the understanding was otherwise.

On July 29, 1954, the decedent's counsel, Mr. Lippman, brought to him various documents which he had theretofore prepared in accordance with decedent's instructions and which were substantially in accordance with the memorandum previously prepared by Mr. Lippman. The documents were thereupon executed and at the same time decedent executed a will leaving the bulk of his estate to appellant, or in the event he did not survive, to appellant's children.

Thereafter appellant negotiated a new lease between the sanitarium corporation and the persons then in occupancy of the sanitarium, obtaining a prepayment of the first 11 months' rent in the sum of $14,100. By the terms of this lease the lessor corporation agreed to complete at its expense an unfinished building upon the sanitarium premises. The evidence on behalf of appellant is to the effect that the decedent was advised of this transaction and expressed his approval thereof.

During the first days of August the decedent became critically ill with severe, constant and racking coughing, an irregular pulse, pneumonia, congestive heart failure, fever, circulatory collapse, a state of shock, marked difficulty in breathing and a lack of coherency. Thereafter the decedent rallied and in about a month was discharged from the hospital.

About the middle of August 1954, and after decedent had been advised by appellant that the unsecured accounts owing by the sanitarium exceeded the sum of $25,000 as had been estimated, decedent demanded an accounting by the appellant of the funds which had been delivered to him. Decedent then took the position that the understanding between himself and appellant when he delivered to the latter the sum of approximately $57,000 was that the money should be used to pay off the unsecured obligations of the sanitarium; the balance or so much thereof as necessary to pay the loans against his annuity contracts and any surplus to be returned to him. Decedent objected to the application by appellant of the sum of $7,300 of the $14,100 received as advance rental under the new lease of the sanitarium which was negotiated by appellant, to the payment of the cost of completing the unfinished building upon the sanitarium premises, stating that this was appellant's obligation. From this time on decedent made repeated demands upon the appellant for an accounting; insisted that appellant should pay off the loans against the annuity contracts; complained that appellant was not complying with

his agreement, and that he was not receiving the income provided for by the agreements.

While the appellant and Mr. Heytow undertook to assure decedent that a full accounting would be rendered as soon as possible, none was immediately forthcoming. As a result decedent became very bitter toward his son. About the end of August he stated to his doctor that he had been cheated and wronged by his son; that he was impoverished and had to borrow $500 from the bank for living expenses. In early September he stated to his brother Abraham Gecht who was then visiting him that when he was in the hospital his doctor had administered a narcotic which caused him to lose his will and that when he came to his senses he did not have anything left; his money and property were gone, to which Abraham Gecht replied: "If it is true, . . . there isn't a judge in the whole world which would deny your rights. I would have him [appellant] arrested."

Although appellant continued to reassure the decedent that a full accounting would be made of the funds entrusted to him and that if it was his father's desire to cancel the entire transaction he would comply with his wishes and reconvey all of the property that had been transferred to him, the decedent was not satisfied and became increasingly more bitter toward his son, accusing appellant of wanting to murder him and bringing about his death.

In late September or early October 1954, in company with his bookkeeper, decedent went to Chicago where they spent five days going over figures furnished by the appellant showing the disposition made by the latter of the funds delivered to him. At this time decedent was promised that a detailed accounting would be forwarded to him but this was not furnished until some time later. Decedent, however, was not satisfied. In November decedent stated to Mr. Lippman that he had consulted another attorney because he was convinced the appellant would not return his properties to him. The decedent stated that the new lawyer had advised an immediate suit upon the ground that decedent was under narcotics and did not know what he was signing when he executed the documents on July 29th. Mr. Lippman said to the decedent that this was not true; that the decedent knew exactly what he was doing at the time; that he was not under medication and that he (Lippman) would not testify in support of any such allegations by the decedent. In this discussion decedent demanded a rescission of the July agreements,

and Mr. Lippman persuaded him to defer any proposed suit until he had an opportunity to write to the appellant. Mr. Lippman, at decedent's direction, thereupon communicated by letter and telephone with the appellant advising him of decedent's demand for a return of the properties, in reply to which appellant stated that if his father wanted the properties back he would return the same and every cent which he had received from his father which had not been spent to pay the obligations of the sanitarium or for his father's benefit. Later decedent consulted still another attorney, a Mr. Miller, whom the decedent requested to prepare a notice of rescission reciting that the transfers made on July 29th had been procured as a result of fraud, duress and undue influence. Although decedent caused this notice of rescission to be recorded in the office of the County Recorder of Los Angeles County he did not then advise appellant of this fact or cause a copy thereof to be served upon him until a later date.

Decedent visited the appellant in Chicago on December 12th and 13th and at that time a discussion was had between them with reference to the return of the properties to the decedent and some of the problems involved therein. Decedent left Chicago on December 13th and went to Milwaukee to visit his brother Abraham. While there he conferred with the respondent Daniel Sobel, an attorney practicing in Wisconsin and the son-in-law of Abraham, telling Sobel that his son and Mr. Heytow had come to him when he was critically ill and pauperized him; that his son had not accounted for all of the assets which he had stolen from him.

On December 15th decedent and Mr. Sobel visited the appellant at his home in Chicago and there delivered to him a copy of the notice of rescission which had been recorded in Los Angeles County as previously stated. Arrangements were then made for a meeting the following day with appellant's counsel, at which time appellant instructed his counsel to do everything necessary to comply with his father's wishes with respect to the return of the properties. On the morning of the following day decedent telephoned his brother Abraham from Chicago and told him he was sick with pains in his chest and that his son and his son's wife were killing and aggravating him; that appellant's wife, whom he called a monster, was calling him names.

On December 17th decedent called upon the appellant's attorney in Chicago, who, in the presence of the decedent,

dictated a letter to the decedent's California attorneys outlining a proposal for the return of all of the properties to the decedent and the cancellation of all agreements executed on July 29th. The decedent appeared to be satisfied but immediately following the meeting he again accused the appellant of trying to murder him. During the night of the same day the decedent requested medication from Dr. Starr stating that he was afraid to do so from his son because the latter might give him something dangerous. On the following day decedent returned to Milwaukee and remained as a guest at his brother's home for about a week. While there he stated that he did not believe his son would return his properties without court action.

Upon his return to California decedent consulted his physician, Dr. Weiss, with respect to an X-ray film which had been taken in Chicago and was advised by the doctor that he had marked cardiac enlargement. The decedent then stated to his doctor that appellant had told him when in Chicago that there was nothing wrong with him; also that while in Chicago the decedent had not been permitted to see his grandchildren and had not been received socially by his son, although he had in fact visited with the appellant and his children at the appellant's home. During this same period he made similar accusations as those previously mentioned against the appellant to various persons.

Throughout February and March of 1955, the attorneys and the parties were exchanging correspondence and drafts of the various documents necessary to effect a cancellation of the July 29th agreements and the return to decedent of the properties transferred by him to the appellant at that time. The decedent was impatient of the delay in the return of his properties and accused the appellant of "stalling." About the middle of March 1955, the decedent was examined by Dr. Weiss and stated to the latter that he was going east to recover his properties. The doctor advised him that in view of his physical condition he should not undertake such a trip but nonetheless decedent flew to Milwaukee and visited his brother. Upon his arrival in Milwaukee he entered a hospital and a medical examination on March 23d revealed that he had a condition of recent myocardial infarction and also suffered from generalized arteriosclerosis and diabetes mellitus with evidence of severe sclerotic changes in the major blood vessels. During his stay in the hospital he was visited by his brother and Mr. Sobel as well as by another attorney to whom he was

introduced by the latter. At this time he repeated to these parties the same accusations against his son previously mentioned. In addition he stated to the admitting physician, Dr. Ninow, that during his illness in July 1954, he had been requested and told by his son to sign over his property to him to avoid the necessity of probate; that he signed over his property while he was under the influence of drugs; that when he recovered he requested the return of his properties but this was refused; that he felt that appellant was trying to hasten his death by giving him medications and new and experimental drugs during his convalescence; that at one time he had been forced to get out of bed and chase his son from the room; that he was afraid to stay in California for fear that the same doctor who had been treating him there was under the influence of his son and that when he went to see his son in Chicago he had been forcibly thrown out of the house.

During his stay in the hospital and shortly prior to March 25, 1955, decedent requested Mr. Sobel to prepare a will for him leaving bequests to his housekeeper, certain charities, $1,000 each to Eli Gecht and David Gecht, the sons of Abraham; $5,000 to Jeanette Sobel, the daughter of Abraham; $1.00 to each of his children and the bulk of his estate to his brother Abraham; with no provision for the appellant's children for whom, in the past, decedent had expressed great affection. Pursuant to these directions Mr. Sobel prepared the will here involved and it was executed by the decedent on March 25th.

The three subscribing witnesses testified that the testator was of sound mind, as did also Dr. Ninow, who examined him the day after the will was executed and who caused this entry to be made in the hospital record: "Patient is well oriented to the three spheres, alert, and cooperative No evidence of hallucinations, delusions, or suicidal tendencies elicited. There is an emotional factor in regard to a misunderstanding with his immediate family and disappointments." In addition a medical expert called upon behalf of the respondents, in response to a hypothetical question, testified that in his opinion the testator at the time he executed his will was of sound mind and not laboring under any insane delusions.

While in the hospital in Milwaukee decedent telephoned to appellant in Chicago and complained of the delay in the preparation of the final documents for the reconveyance of

the properties to him and although appellant undertook to assure him that everything was being done to complete the transaction as soon as possible, the decedent became very angry and shouted that the matter would result in the "bloodiest lawsuit" and that the appellant would go to jail and to the gallows. In the midst of this conversation decedent's brother took the telephone and accused appellant of having pauperized the decedent and having tried to poison him. When the decedent came back on the telephone and when appellant asked him why he permitted his brother to speak to him in this manner the decedent replied: "Well, that's what they all say."

Finally on April 1, 1955, a meeting was held at the office of Mr. Becker, at which there were present in addition to the latter, the decedent, Mr. Sobel and appellant. At this meeting all of the documents necessary to effect a reconveyance to the decedent of all of the properties which he had previously transferred to the appellant were executed and a detailed accounting of the funds which had been delivered to the appellant was approved.

On April 3d decedent telegraphed appellant expressing affection and his hope that he would see his son's children and saying that his spirits had been raised by the receipt of a letter from his son the previous day. Thereafter decedent spoke to his son over the telephone and expressed the hope that he would be able to see him and his children before returning to California. However, he returned to California without visiting his son, arriving in Los Angeles on April 19th and died on April 28th.

We have set forth at some length the evidence upon which appellant relies in support of his assertion that the trial court's finding, that the decedent at the time he executed his will was of sound mind and was not laboring under an insane delusion, is unsupported by the evidence. The argument is that the evidence fails to disclose any basis in fact for the decedent's statements and charges of wrongdoing directed against his son hereinbefore mentioned. This is but to say that the trial court, upon this premise, was compelled as a matter of law to find that when executing his will the decedent was of unsound mind notwithstanding the legal presumptions to the contrary and despite the testimony of the subscribing witnesses and that of Dr. Ninow, previously mentioned, to the effect that he was then of sound mind. ██ Conceding that the showing made by the appellant to the contrary was

substantial and if the trial court had found in favor of the appellant upon this issue, such finding would have been supported by the evidence, this court is without power to reweigh the evidence and substitute its judgment for that of the trial court. (*Estate of Scott* (1900), 128 Cal. 57, 66 [60 P. 527].)

Assuming for the purpose of this discussion that all of the statements and charges made by the decedent concerning his son, to which reference has heretofore been made, were false and without foundation in fact, this alone would not serve to compel the conclusion that in entertaining a belief in the truth thereof decedent was laboring under an insane delusion.

In the *Estate of Scott, supra,* the facts were in many respects similar to those here. There the testatrix had made statements that the contestant, her husband, was unfaithful to her, that he had attempted to poison her and to cause her to be placed in an insane asylum. The Supreme Court, while pointing out that there was no evidence in the record to support any of these charges, nonetheless affirmed the order admitting the will to probate, saying (pp. 65-66) :

"The finding that the testatrix was not under any delusion upon these subjects is equivalent to a finding that all of the elements necessary to create a delusion in respect to either of them did not exist. If the evidence before the court was such as to authorize it to find that she did not in reality believe in the truth of the statements made by her, or that she made them in consequence of evidence of facts in reference thereto that had been brought to her knowledge, its findings must be sustained. *The fact of her making the accusations was not conclusive upon the point, as they may have been made with perverse will, or in the heat of passion, or by reason of some unfounded belief, or some feeling of indignation or resentment.* The court was required to determine whether, upon all the evidence before it, there was established such a fixed belief on her part in the existence of the truth of these charges as to constitute delusion. For this purpose it was proper to consider her nature and temperament, the circumstances under which the statements were made, the habits of her life and association with others, and also her conduct toward her husband, and the nature of her intercourse with him during the period within which they were made.

"If the contest had been tried before a jury, the court would not have been authorized to direct a verdict in favor of the contestant merely upon the testimony that she had

made these accusations or charges, and that they were without foundation in fact, since the weight and credit to be given to this testimony for the purpose of determining whether the statements were the offspring of a delusion, or were a mere false accusation, could be determined only by the jury. (*Brooke* v. *Townshend*, 7 Gill. 32.) Any attempt by the court to control the jury by instruction, or even by suggestion as to the process of reasoning by which they should determine. the issue before them, or in reference to the weight or credibility to be given to the evidence, would be an invasion of their province (*Estate of Carpenter, supra* [94 Cal. 406 (29 P. 1101)] ; and, although there was no jury in the present case, the action of the court in determining questions of fact is attended with the same incidents and presumptions as that of a jury, and the weight and credibility given by it to the evidence is entitled to the same consideration as if passed upon by a jury under proper instructions. We cannot, as an appellate court, determine that the trial court did not sufficiently consider the testimony of these witnesses, or give proper weight thereto; nor can we substitute our judgment for that of the trial court as to the conclusion which should have been reached thereon.'' (Emphasis added.)

█ Other considerations aside, it is a reasonable inference from the evidence that the motivating factor which induced the decedent to exclude the appellant from any participation in his estate was his hostility toward his son engendered by the decedent's belief that the appellant had wronged him in connection with the transaction of July 29, 1954. However mistaken and unreasonable this belief may have been it does not serve to establish that in entertaining the same the decedent was laboring under an insane delusion. As said in the *Estate of Struve* (1929), 100 Cal.App. 255, 259 [279 P. 846] : ''Whatever may have been the reason for being put out because of the actions of her sons, it is evident that her [testatrix's] belief that she had been wronged by them was nothing more than a mistaken belief which under no possible theory can be held to be an insane delusion.''

█ The proponents made a prima facie case for the admission of the will to probate when they adduced evidence to the effect that the will was executed in accordance with law and that at the time that the decedent executed the same he was of sound mind. The testimony adduced by the appellant to the contrary merely served to create a conflict in the

evidence as to this issue, and no decision in this state has been brought to our attention wherein it is declared that in such circumstance an appellate court may reverse the order admitting the will to probate.

We now turn our attention to appellant's contention that the trial court's finding in favor of the respondents upon the issue of undue influence is unsupported by the evidence. In urging this contention the appellant, in addition to the evidence upon which the issue of testamentary capacity previously referred to, points to the following: that the provisions of the will are unnatural in that no provision is made for the appellant who was the natural object of decedent's bounty; that Mr. Sobel, who prepared the will, was at the time and for some years prior thereto had been the attorney for Abraham Gecht as well as an employee in the latter's grocery store and that Mrs. Sobel was given a legacy of $5,000 by the will.

It is contended that by virtue of the foregoing there was brought into play the doctrine, as stated by appellant, that where a confidential relationship exists between the decedent and a beneficiary, coupled with activity upon the part of the beneficiary or his agent or representative in the preparation of the will a presumption of undue influence arises which operates to cast upon the proponent the burden of showing that the will was not the product of imposition or undue influence.

Assuming appellant's statement to be a correct statement of the law (*cf. Estate of Shay*, 196 Cal. 355 [237 P. 1079]; *Estate of Relph*, 192 Cal. 451 [221 P. 361]; *Estate of Graves*, 202 Cal. 258 [259 P. 935]) and conceding without deciding that the doctrine adverted to is applicable in the circumstances here, the question as to whether or not the presumption has been dispelled by evidence is one of fact for the trial court. (*Estate of Comino* (1942), 55 Cal.App.2d 806, 811 [131 P.2d 599].)

In the *Estate of Merrick* (1949), 93 Cal.App.2d 624 [209 P.2d 666], the court said (p. 627): "The presumption of undue influence may be overcome by other circumstances which show affirmatively that the decedent's volition accompanied the testamentary act. The *indicia* of undue influence may be explained and rebutted by the testimony of persons who were present at the time the instrument was executed, by proof that the decedent gave instructions for the preparation of the script, and by evidence showing that he subse-

quently affirmed or expressed approval of its provisions (26 Cal.Jur. 649 and cases cited).''

From the evidence the trial court was warranted in concluding as it did that the presumption of undue influence, if existent, was overcome. Mr. Sobel testified that when the decedent requested him to prepare a will he asked whether he would not prefer to have another lawyer undertake the task and the decedent replied that he wanted him to do so. He thereupon dictated to Mr. Sobel the terms of the will, following which a draft was prepared and submitted to the decedent. This was gone over and changes were discussed in the presence of another attorney, Mr. Podell, and the will was redrawn to conform to the changes indicated by the decedent. There is no testimony that Mr. Sobel or Abraham Gecht or any member of the latter's family at any time made any suggestions to the decedent as to the disposition which he should make of his estate and Abraham did not learn of the contents of the will until after the testator's death.

In order to avoid a will on the ground of undue influence there must be an actual showing of some sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of execution. (*Estate of Del Fosse* (1945), 67 Cal.App.2d 490, 497 [154 P.2d 734].) There was no such showing here. The fact that both Mr. Sobel and Abraham may have made statements with respect to the appellant similar to those uttered by the decedent, to which we have previously referred, is of no compelling significance for in doing so they were but repeating that which they had been told by the latter, and there is no proof that they did not believe them to be true. Neither Mr. Sobel nor Abraham was present at the time of the transaction between the decedent and his son on July 29, 1954, and they had no knowledge as to what then transpired between the parties except the information which they derived from the decedent. There is no evidence that the hostility which the decedent developed toward his son was the product of any statements or representations made to him by Mr. Sobel or Abraham. This sprang from the decedent's resentment against his son because of his belief that he had been wrongfully dealt with by the appellant. Moreover, that both Mr. Sobel and Abraham may have manifested hostility toward the appellant does not serve to establish undue influence any more than does the fact that they may have had both the opportunity and motive to exercise

such influence upon the testator. ■ As has frequently been observed "mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient." (*Estate of Agnew* (1944), 65 Cal.App.2d 553, 564 [151 P.2d 126].) ■ Neither was the trial court compelled to find that the will was the product of undue influence by the testimony that subsequent to the execution of the will the decedent had made statements to the effect that he had been induced to execute the will by his brother Abraham and members of his family. Such evidence was not admissible as evidence of the truth of the facts stated but only as evidence of the decedent's then state of mind. (*Estate of Gleason* (1913), 164 Cal. 756, 761-762 [130 P. 872].)

While the contestant's appeal invites our sympathy it presents nothing but factual questions which have been finally resolved against him by the findings and judgment of the trial court.

The order appealed from is affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 14, 1959.